510

SUPREME COURT,SUPREME COURT,

Jones vs. Clifford's Ex'r.—Statement of Case.Jones vs. Clifford's Ex'r.—Statement of Case.

**JAMES C. JONES, APPELLANT, vs. WILLIAM J. FELL, EXECUTOR OF S. G. CLIFFORD, DECEASED, APPELLEE.**

An agreement amongst Pilots to associate together for their business, is not illegal.

Appeal from a judgment of the Circuit Court for Escambia County, in the Western Circuit.

This was an action of assumpsit, instituted by the appellee in the Court below, to recover an amount as a balance claimed to be due from appellant to Clifford, the appellee's testator, upon an account stated. Non assumpsit was pleaded, upon which issue was joined.

On the trial of the cause, Edward Onixon, a witness for plaintiff, testified that Clifford, the Appellee's testator, Jones, the appellant, and he, the witness, were partners, equal in interest, in piloting; that they were in the habit of settling up every quarter until the month of October; that Clifford was taken sick in the latter part of November, 1850, in consequence of which there was no other settlement until the 6th of March, 1851, when it appeared that Jones had overdrawn his share of the profits of the business to the amount of $192.10, and the witness had overdrawn his share some $40 to $60. Jones acknowledged all in account to be correct. Whether Jones paid anything at that time, or since, the witness says he does not know. The above settlement of accounts was made at the request of Clifford, and it was agreed that whatever had been overdrawn by either, should be paid. To this Jones made no objection.

On his cross examination, he stated "that the partnership between himself, Clifford and Jones continued for several

years; that according to their by-laws, each was on duty one day, and off duty two days, and when either was absent, he drew his share of the profits when he returned; that the understanding was, that one of them should at all times be on duty, and not more than one, unless they were needed, and that under this arrangement, they shared alike in the profits; that they had by-laws, which imposed a forfeiture in cases of delinquency. If the pilot on service was on the look out, we did not all go after a vessel, unless there was a second vessel. Clifford's sickness did not affect or abridge his right to a share of the profits. The partnership contined to the 6th of March, 1851. I left at one time, with the leave of the Port Wardens. We had the liberty to go where we pleased during the two days of respite; but if we were not actually on the bar, we were there. It was the duty of all three pilots to be there, but under our arrangements, but one was on the watch, or look out; but if either was absent when wanted, he forfeited his share of the profits. But this arrangement did not relieve any of them from duty. The one on duty on the bar was the lookout, but none were afloat at such time. No injury resulted to commerce, or the service in which they were engaged, by this partnership, as far as witness knows. Two of the Port Wardens advised this association. On one occasion, he, witness, heard that a vessel could not get a pilot off Pensacola bar."

Mr. Kelly, a witness for defendant, testified that he has been been Port Warden for many years, both at this port and elsewhere; that he has always been of opinion that these combinations among pilots were injurious to commerce, and the harbor where vessels come in. This, however, is only his individual opinion; that three pilots were appointed for this port; that it was expected that they should be on duty, except when absent by leave of the Port

512      SUPREME COURT,

Wardens. This witness further stated that if the matter had been officially reported to the Port Wardens, he, as one of that Board, would have ordered a dissolution or annulment of such combination. He says that three pilots were considered necessary, but that he does not know that it was necessary for all of them to be constantly on the lookout.

The Court charged the jury that a contract in violation of public policy, or in contravention of a public statute, is void in law; and also that if the parties in this case made a contract the tendency of which was dangerous and injurious to commerce and navigation, such contract would be void, as against public policy.

The defendant, amongst other things, asked of the Court the following instruction to the jury: If the jurors are satisfied that there were three pilots appointed by the Board of Port Wardens, then they are to presume that the public service required these pilots, and that any partnership or combination amongst the pilots so appointed, by which one or two were relieved from duty, even for a day, was therefore in derogation of a public duty, and consequently void. This instruction was refused by the Court, and the defendant excepted.

A verdict and judgment having been rendered for plaintiff, defendant moved for a new trial, which was refused by the Court, and defendant appealed.

*R. L. Campbell* for Appellant.

BALTZELL, C. J., delivered the opinion of the Court:

This is a suit instituted by a pilot of the harbor of Pensacola, to recover from one of his associates, a share of the profits claimed to be due him under agreement to unite in the business of pilotage.

The error complained of is in the refusal of the Circuit Court to give an instruction asked in the following terms ; " If the Jurors are satisfied that there were three pilots appointed by the Board of Port Wardens, then they are to presume that the public service required three pilots, and that any partnership or combination amongst the pilots so appointed, by which one or two were relieved from duty even for a day, was, therefore, in derogation of a public duty, and consequently void."

This maintains the position that all the pilots of a port are to be constantly engaged, and that an arrangement for the relief of one of them, for any time, however small, is illegal and improper. Whilst the act of 1822, providing for the appointment of pilots, prohibits persons from acting who are not appointed, under a penalty, (Duval 62,) yet, the regulation of them and establishment of all such ordinances as they shall deem advisable, with the power of removal and to fix and alter the rates of pilotage, is by special law left to the Board of Port Wardens for the harbor. Thompson's Dig., 256.

There is no rule or regulation (as appears from the record), of this Board of Officers making provision for this constant attention to duty, and it may be questioned, we think, whether one carried to such an extreme of strictness, would be either politic or proper. It would be a different thing to require that a sufficient number of the pilots appointed should be kept engaged to supply the wants of the harbor.

Nor does it follow as a necessary consequence, that because three were appointed, the engagement of them all, without any relief, was necessary or requisite. The reasonable presumption, we think, is that a number was appointed sufficient to provide for casualties and sickness, and to give such relief as the exigencies, not only of a day,

but even a longer time might make necessary for one or more of the pilots.

As a general rule, the law gives its command to its officers, with a large discretion as to the mode of execution, yet exacting a faithful performance. Thus, pilots whose business it is, of most delicate and important character, to guide and conduct vessels in safety over the bars, and through the intricacies of a channel into a harbor, are required to be on the alert, to render in due season the requisite assistance. For neglect of duty or other misconduct, they are liable to be discharged or dismissed, and have their license revoked; they are also responsible in damages to the parties injured. As already remarked, they are placed under the governance and directions of officers, whose duty it is to give licenses, only to persons possessed of an intimate acquaintance with the particular navigation, of integrity, diligence, activity, sobriety and steadiness, and of the skill to manage all the vessels that may trade to the port.

It seems to be the practice in other ports to require bond and security, and an oath to discharge the duties faithfully. The Port Wardens may possibly possess the power to establish a rule, such as is insisted on, and if one had been shewn in this case, it would certainly have received from the Court a very respectful consideration. As it is, we have no power to declare or create such a one, or to consider this case as if one existed, and had been disregarded by the pilots.

It is insisted that an association " amongst pilots is in violation of public policy, tending to impair competition between them, and diminish their exertions in the public service; that they share alike in the profits is sufficient to destroy all emulation." It is also insisted that the Court

shall affirm the truth of these propositions as matter of law, and without reference to the facts.

It will be seen at once that the question is, and would be embarrassing to persons unacquainted with, and having little practical knowledge or experience of the subject, whether such an association is wise or unwise, beneficial or injurious to commerce, and may not be determined by reference to the books, for no authority has been cited, or is to be found on the subject, so far as research has extended, but would best be ascertained by the examination of persons whose interest or duty may prompt them to watch its operation. In this case one of the Port Wardens, Mr. Kelly, thinks it injurious, whilst two of the others, Messrs. LeBaron and Mitchell, advised it—the Board not acting nor prohibiting it. At the bar of the Mississippi there are fifty pilots organized into an association having a principal and Board of Directors, with regular government and rules for distribution of service, pay, &c.

After an experience of ten years, the system was found to work well. The evidence for the good order, faithfulness, decorum and entire efficiency of the pilot union was unanimous. See report of Committee of Legislature of Louisiana, 2 DeBow In. Res. 8, 10.

Associations are so common an element, not only in commerce, but in all the affairs of life, that it would be rather perilous on the part of the Court, to assert that they impair competition, destroy emulation and diminish exertion. There is scarcely an occupation in life, scarcely a branch of trade, from the very largest to the smallest, that does not feel the exciting and invigorating influence of this wonderful instrumentality. It made and conducts our government, constructs our railroads, our steam vessels, our magnificent ships, our temples of worship, structures

for public and private use, our manufactories, creates our institutions for learning, builds up our cities and towns.

Its very office is to do what individual exertion may not accomplish, and in a degree distinguishes civilized from savage life. Why then should this important agency be denied to this meritorious class of our citizens? They are in general men of small means, to whom an association may not only be desirable, but necessary and indispensable. Were our minds less clear on the subject, we are not permitted to assert the invalidity of the act on this account.

"An agreement is not void on this ground, unless it expressly and unquestionably contravene public policy, and be manifestly injurious to the interests of the State." Chitty on Cont., 664.

We are then of opinion, that there was no error in the Court's refusing the instruction asked.

The second instruction asked was given in substance by the Court, in the last charge, that a contract, the tendency of which was dangerous and injurious to commerce, was void as against public policy, nor is there any reason, that we can perceive, for granting a new trial.

The judgment will be affirmed with costs.