UNITED STATES v. TRANS-MISSOURI FREIGHT ASSOCIATION et al.

(Circuit Court of Appeals, Eighth Circuit. October 2, 1893.)

No. 236.

1. STATUTES—CONSTRUCTION.
   Every statute must be read in the light of the general laws upon the same subject in force at the time of its enactment.

2. SAME—CRIMINAL LAWS—COMMON-LAW OFFENSE ADOPTED BY CONGRESS.
   Where congress adopts or creates a common-law offense, and in doing so uses terms which have acquired a well-understood meaning by judicial interpretation, the presumption is that the terms were used in that sense, and courts may properly look to prior decisions interpreting them for the meaning of the terms and the definition of the offense where there is no other definition in the act.

3. MONOPOLIES—RESTRAINT OF INTERSTATE COMMERCE.
   The contracts, combinations in the form of trust or otherwise, and conspiracies in restraint of trade declared to be illegal in interstate and international commerce by the act of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," (26 Stat. 209, c. 647; Rev. St. Supp. 762,) are the contracts, combinations, and conspiracies in restraint of trade that had been declared by the courts to be against public policy and void under the common law before the passage of that act.

4. SAME.
   The test of the validity of such contracts or combinations is not the existence of restriction upon competition imposed thereby, but the reasonableness of that restriction under the facts and circumstances of each particular case. Public welfare is first considered, and, if the contract or combination appears to have been made for a just and honest purpose, and the restraint upon trade is not specially injurious to the public, and is not greater than the protection of the legitimate interest of the party in whose favor the restraint is imposed reasonably requires, the contract or combination is not illegal. Shiras, District Judge, dissenting, on the ground that this rule is not applicable to corporations charged with public duties.

5. SAME—COMMON-LAW RULE.

The ground on which certain classes of contracts and combinations in restraint of trade were held illegal at common law was that they were against public policy.

6. PUBLIC POLICY—HOW DETERMINED.

The public policy of the nation must be determined from its constitution, laws, and judicial decisions.

7. SAME—INTERSTATE COMMERCE.

The act of February 4, 1887, entitled "An act to regulate commerce," demonstrates the fact that from the date of the passage of that act it has been the public policy of this nation to regulate that part of interstate commerce which consists of transportation, and to so far restrict competition in freight and passenger rates between railroad companies engaged therein as shall be necessary to make such rates open, public, reasonable, uniform, and steady, and to prevent discriminations and undue preferences.

8. EQUITY—HEARING ON BILL AND ANSWER—EVIDENCE.

When a suit is heard on bill and answer, the allegations of fact in the bill that are denied in the answer are to be taken as disproved, and the averments of fact in the answer stand admitted.

9. SAME.

Where the contract is admitted, but the allegations tending to show its sinister purpose, tendency, and effect contained in the bill are denied by the answer, and averments tending to show a just and honest purpose, tendency, and effect are made, the latter averments contained in the answer stand admitted, and the contract will be presumed to have been made for an honest and legitimate purpose, unless the provisions of the agreement clearly show the contrary. In the examination of such a contract, fraud and illegality are not to be presumed.

10. CONTRACTS—PUBLIC POLICY.

Freedom of contract is as essential to unrestricted commerce as freedom of competition, and one who asks the court to put restrictions upon the right to contract ought to make it clearly appear that the contract assailed is against public policy.

11. SAME—RESTRAINT OF TRADE—ANTI-TRUST ACT.

A contract between railroad companies forming a freight association that they will establish and maintain such rates, rules, and regulations on freight traffic between competitive points as a committee of their choosing shall recommend as reasonable; that these rates, rules, and regulations shall be public; that there shall be monthly meetings of the association, composed of one representative from each railroad company; that each company shall give five days' notice before some monthly meeting of every reduction of rates or deviation from the rules it proposes to make; that it will advise with the representatives of the other members at the meeting relative to the proposed modification, will submit the question of its proposed action to a vote at that meeting, and, if the proposition is voted down, that it will then give ten days' notice that it will make the modification notwithstanding the vote before it puts the proposed change into effect; that no member will falsely bill any freight, or bill any at a wrong classification; and that any member may withdraw from the association on a notice of thirty days,—appears to be a contract tending to make competition fair and open, and to induce steadiness of rates, and is in accord with the policy of the interstate commerce act. Such agreement cannot be adjudged to be a contract or conspiracy in restraint of trade under the anti-trust act when it is admitted that the rates maintained under the same have been reasonable, and that the tendency has been to diminish, rather than to enhance, rates, and there is no other evidence of its consequences or effect. Shiras, District Judge, dissenting. 53 Fed. Rep. 440, affirmed.

12. SAME.

No monopoly of trade or attempt to monopolize trade within the meaning of the anti-trust act is proved by such a contract.

13. SAME.

The railroad companies who are parties to such a contract do not thereby substantially disable themselves from the discharge of their public duties.

Appeal from the Circuit Court of the United States for the District of Kansas. Affirmed.

Statement by SANBORN, Circuit Judge:

This is an appeal from a decree of the circuit court dismissing a bill brought by the United States against the Trans-Missouri Freight Association and 18 railroad companies, under the provisions of the act of congress of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," commonly known as the "Sherman Anti-Trust Act," (26 Stat. 209, c. 647; Rev. St. Supp. 762,) to dissolve the association, and enjoin the railroad companies from fulfilling an agreement with each other to have and maintain joint rules, regulations, and rates for carrying freight between competing points upon their several roads. The case was heard on the bill and the answers of the several defendants.

The bill alleges that the defendant railroad companies were corporations and common carriers, and that they owned independent and competing lines of railroad in that part of the United States west of the Mississippi and Missouri rivers; that they were engaged in transporting freight among the states and to and from foreign nations, and that they had been encouraged to construct and maintain these competing lines of railroad independent of each other by subsidies and grants of lands from the United States and the people of the states and territories west of these great rivers. The bill then alleges that, not being content with the rates of freight they were receiving, intending oppressively to augment those rates, to counteract the effect of free competition upon them, to establish and maintain arbitrary rates, and to procure large sums of money from the people of those states and territories engaged in interstate commerce, they entered into an agreement on March 15, 1889, which, as subsequently modified, reads thus:

"Memorandum of agreement, made and entered into this fifteenth day of March, 1889, by and between the following railroad companies, viz.: Atchison, Topeka & Santa Fe Railroad, Chicago, Rock Island & Pacific Railway, Chicago, St. Paul, Minneapolis & Omaha Railway, Burlington & Missouri River Railroad in Nebraska, Denver & Rio Grande Railroad, Denver & Rio Grande Western Railway, Fremont, Elkhorn & Missouri Valley Railroad, Kansas City, Ft. Scott & Memphis Railroad, Kansas City, St. Joseph & Council Bluffs Railroad, Missouri Pacific Railway, Sioux City & Pacific Railroad, St. Joseph & Grand Island Railroad, St. Louis & San Francisco Railway, Union Pacific Railway, Utah Central Railway, and such other companies as may hereafter become parties hereto. Witnesseth, for the purpose of mutual protection, by establishing and maintaining reasonable rates, rules, and regulations on all freight traffic, both through and local, the subscribers do hereby form an association, to be known as the Trans-Missouri Freight Association, and agree to be governed by the following provisions:

"Article I.

"The traffic to be included in the Trans-Missouri Freight Association shall be as follows:

"1. All traffic competitive between any two or more members hereof passing between points in the following described territory, commencing at the Gulf of Mexico, on the 95th meridian; thence north to the Red river; thence via that river to the eastern boundary line of the Indian territory; thence north by said boundary line and the eastern line of the state of Kansas to the Missouri river, at Kansas City; thence via the said Missouri river to the point of intersection of that river with the eastern boundary of Montana; thence via the said eastern boundary line to the international line,—the foregoing to be known as the 'Missouri River line;' thence via said international line to the Pacific coast; thence via the Pacific coast to the international line between the United States and Mexico; thence via said international line to

the Gulf of Mexico, and thence via said Gulf to the point of beginning, including business between points on the boundary line as described.

"2. All freight traffic originating within the territory as defined in the first section when destined to points east of the aforesaid Missouri river line.

## "Exceptions.

"(a) The D. & R. G. and the D. & R. G. W., except their business to and from points in Colorado west of the D. & R. G. line between Denver and Trinidad; also business via their lines between points in Colorado and points in Utah.

"All local business between Denver and Trinidad and intermediate points; all local business of the A., T. & S. F. between Pueblo and Canon City, Colo.; all stone traffic having both origin and destination within the state of Colorado.

"The jurisdiction of this association, in so far as the business of the Denver & Rio Grande and the Denver and Rio Grande Western Railway Companies is concerned, covers the following traffic, namely:

"All freight traffic to, from, or through all common or junction points in the states of Nebraska and Kansas and the Indian Territory, originating at or destined to Denver, Colorado Springs, Pueblo, or Trinidad.

"All freight traffic between Ogden, Spanish Fork, and intermediate points on the one hand, and to, from, or through points in Kansas or Nebraska upon or east of the 103d meridian, on the other hand.

"Traffic which may be excluded under the application of the above is only such as may be delivered to or received from the Denver & Rio Grande Railroad and Denver and Rio Grande Western Railway.

"(b) Traffic included in the Trans-Continental and International Association.

"(c) Traffic passing between points in Kansas or Nebraska and Mississippi river points, Carondelet and south; also traffic passing between points in Kansas or Nebraska and points in the southern states east of the Mississippi river and south of the south line of Kentucky and Virginia, regardless of the route by which the business crosses the Mississippi or Ohio rivers.

"(d) Traffic passing between Missouri river points and points in the territory east of said river.

"(e) All traffic to points on the Northern Pacific and Manitoba Railways.

"(f) Traffic to points in Arkansas.

"(g) Coal, stone, and gravel from Colorado, Wyoming, and Dakota, to points in Kansas and Nebraska, and to Sioux City, Council Bluffs, or Pacific Junction, Iowa, St. Joseph, Kansas City, or Boswell, Mo.

"(h) The interchange of traffic with the Colorado Midland and South Park Companies, to or from Aspen, Colorado, Glenwood Springs, Colorado, and intermediate points, including coal branches therefrom, and Buena Vista, Colorado, and Leadville, Colorado.

"(i) Business to and from Florence, Colorado, by all lines.

## "Article II.

"Section 1. The association shall, by unanimous vote, elect a chairman of the organization. The chairman may be removed by a two-thirds vote of the members.

"Sec. 2. There shall be regular meetings of the association at Kansas City, unless notice shall be given by the chairman that the business to be transacted does not warrant calling the members together, which notice shall be given not less than four days before the day set for the meeting. When a meeting, regular or special, is convened, it shall be incumbent upon each party hereto to be represented by some officer authorized to act definitely upon any and all questions to be considered. Each road shall designate to the chairman one person who shall be held personally responsible for rates on that road. Such person shall be present at all regular meetings when possible, and shall represent his road, unless a superior officer is present. If unable to attend, he shall send a substitute, with written authority to act upon all questions which may arise, and the vote of such substitute shall be binding upon the company he represents.

"Sec. 3. A committee shall be appointed to establish rates, rules, and reg-

ulations on the traffic subject to this association, and to consider changes therein, and make rules for meeting the competition of outside lines. Their conclusions, when unanimous, shall be made effective when they so order; but if they differ the question at issue shall be referred to the managers of the lines parties hereto, and if they disagree it shall be arbitrated in the manner provided in article 7.

"Sec. 4. At least five days' written notice prior to each monthly meeting shall be given the chairman of any proposed reduction in rates, or change in any rule or regulation governing freight traffic; eight days in so far as applicable to the traffic of Colorado or Utah.

"Sec. 5. At each monthly meeting the association shall consider and vote upon all changes proposed of which due notice has been given, and all parties shall be bound by the decision of the association so expressed, unless then and there the parties shall give the association definite written notice that in ten days thereafter they shall make such modification, notwithstanding the vote of the association: provided, that, if the member giving notice of the change shall fail to be represented at the meeting, no action shall be taken on its notice, and the same shall be considered withdrawn. Should any member insist upon a reduction of rate against the views of the majority, or if the majority favor the same, and if, in the judgment of said majority, the rate so made affects seriously the rates upon other traffic, then the association may, by a majority vote upon such other traffic, put into effect corresponding rates, to take effect upon the same day. By unanimous consent any rate, rule, or regulation relating to freight traffic may be modified at any meeting of the association without previous notice.

"Sec. 6. Notwithstanding anything in this article contained, each member may, at its peril, make at any time, without previous notice, such rate, rule, or regulation as may be necessary to meet the competition of lines not members of the association, giving at the same time notice to the chairman of its action in the premises. If the chairman upon investigation shall decide that such rate is not necessary to meet the direct competition of lines not members of the association, and shall so notify the road making the rate, it shall immediately withdraw such rate. At the next meeting of the association held after the making of such rate it shall be reported to the association, and, if the association shall decide by a two-thirds vote that such rate was not made in good faith to meet such competition, the member offending shall be subject to the penalty provided in section 8 of this article. If the association shall decide by a two-thirds vote that such rate was made in good faith to meet such competition, it shall be considered as authority for the rate so made.

"Sec. 7. All arrangements with connecting lines for the division of through rates relating to traffic covered by this agreement shall be made by authority of the association: provided, however, that when one road has a proprietary interest in another the divisions between such roads shall be what they may elect, and shall not be the property of the association: provided, further, that, as regards traffic contracts at this date actually existing between lines not having common proprietary interests, the same shall be reported, so far as divisions are concerned, to the association, to the end that divisions with competing lines may, if thought advisable by them, be made on equally favorable terms.

"Sec. 8. It shall be the duty of the chairman to investigate all apparent violations of the agreement, and to report his findings to the managers, who shall determine by a majority vote (the member against whom complaint is made to have no vote) what, if any, penalty shall be assessed, the amount of each fine, not to exceed one hundred dollars, to be paid to the association. If any line party hereto agrees with a shipper, or any one else, to secure a reduction or change in rates, or change in the rules or regulations, and it is shown upon investigation by the chairman that such an arrangement was effected, and traffic thereby secured, such action shall be reported to the managers, who shall determine, as above provided, what, if any, penalty shall be assessed.

"Sec. 9. When a penalty shall have been declared against any member of this association, the chairman shall notify the managing officer of said com-

pany that such fine has been assessed, and that within ten days thereafter he will draw for the amount of the fine; and the draft, when presented, shall be honored by the company thus assessed.

"Sec. 10. All fines collected to be used to defray the expenses of the association, the offending party not to be benefited by the amounts it may pay as fines.

"Sec. 11. Any member not present or fully represented at roll call of general or special meetings of the freight association, of which due and proper notice has been given, shall be fined one dollar, to be assessed against his company, unless he shall have previously filed with the chairman notice of inability to be present or represented.

## "Article III.

"The duties and powers of the chairman shall be as follows:

"Section 1. He shall preside at all meetings of the association, and make and keep a record thereof, and promulgate such of said proceedings as may be necessary to inform the parties hereto of the action taken by the association.

"Sec. 2. He shall at all times keep and publish for the use of the members a full record of the rates, rules, and regulations prevailing on all lines parties hereto on business covered by this agreement, and each of the parties hereto agrees to furnish such number of copies of the rates, rules, and regulations issued by it as the chairman may require.

"Sec. 3. He shall construe this agreement and all resolutions adopted thereunder, his construction to be binding until changed by a majority vote of the association.

"Sec. 4. He shall publish in joint form all rates, rules, or regulations which are general in their character and apply throughout the territory of the association, and shall also publish in the manner above such rates, rules, or regulations applying on traffic common to two or more lines as may be agreed upon by the lines in interest.

"Sec. 5. He shall be furnished with copies of all waybills for freight carried under this agreement when called for, and shall furnish such statistics as may be necessary to give members general information as to the traffic moved, subject to the provisions of the Interstate Commerce Railway Association agreement as to lines members thereof.

"Sec. 6. He shall render to each member of the association monthly statements of the expenses of the association, showing the proportions due from each, and shall make drafts on members for the different amounts thus shown to be due.

"Sec. 7. He shall hear and determine all charges of violations of this agreement, and assess, collect, and dispose of the fines for such violations as provided for herein.

"Sec. 8. The chairman shall be empowered to authorize lines in the association to meet the rates of another line or other lines in the association when in his judgment such action is justified by the circumstances; this, however, not to act in any way as an indorsement of an unauthorized rate made by any member.

"Sec. 9. Only parties interested shall vote upon questions arising under the agreement, and in case of doubt the chairman shall decide as to whether any party is so interested or not, subject to appeal, as provided by section 3 of article 3 of the agreement.

## "Article IV.

"Any willful under-billing in weights or billing of freight at wrong classification shall be considered a violation of this agreement, and the rules and regulations of any weighing association or inspection bureau as established by it, or as enforced by its officers and agents, shall be considered binding under the provisions of this agreement, and any willful violation of them shall be subject to the penalties provided herein.

## "Article V.

"The expenses of the association shall be borne by the several parties in such proportion as may be fixed by the chairman. Any member not satisfied with the allotment so made may appeal to the association, which shall, at

its first regular meeting thereafter, determine the matter, which may be done by a two-thirds vote of the members.

"Article VI.

"There shall be an executive committee of three members, to be elected by unanimous vote. The committee shall approve the appointment and salaries of necessary employes, except that of the chairman, and authorize all disbursements. All action of this committee shall be unanimous.

"Article VII.

"In case the managers of the lines parties hereto fail to agree upon any question arising under this agreement that shall be brought before the association, it shall be referred to an arbitration board, which shall consist of three members of the executive board of the Interstate Commerce Railway Association: provided, however, that, in case of arbitration in which the members of this association only are interested, they may, by unanimous vote, substitute a special board.

"Article VIII.

"This agreement shall take effect April 1, 1889, subject thereafter to thirty days' notice of a desire on the part of any line to withdraw from or amend the same."

The bill further alleges that this agreement took effect April 15, 1889; that under it rules, regulations, and rates for carrying freight over the railroads of the defendant companies were fixed by the association, and have since been maintained by them; that since that date these railroad companies have declined and refused at all times to fix or give rates for the carriage of freight based upon the cost of constructing and maintaining their several lines of railroad and the cost of carrying freights over the same, and such other elements as should be considered in establishing tariff rates upon each particular road; and that the people engaged in interstate commerce have been compelled to pay the arbitrary rates of freight, and to submit to the arbitrary rules and regulations established and maintained by the association formed under the agreement, and have been and are deprived of the benefits that might be expected to flow from free competition between the several lines of railroad of the defendant companies, and that in this way the defendant companies have combined in restraint of trade and commerce among the states, and have attempted to monopolize, and have monopolized, a part of this commerce.

Three of the railroad companies were not members of the association, and will not be further noticed. The answers of the 15 companies who were members of the association are substantially the same. The first defense in these answers is that the interstate commerce law of February 4, 1887, entitled "An act to regulate commerce," (24 Stat. 379, c. 104; Rev. St. Supp. 529,) and the acts amendatory thereof, constitute a complete code of laws regulating that part of commerce among the states and with foreign nations which relates to transportation, and that the act of July 2, 1890, is not applicable to, and does not govern, them or their actions.

Coming to the merits of the suit, these defendants admit that they are common carriers; that, with some exceptions not important here, they owned independent and competing lines of railroad in that part of the United States west of the Missouri and Mississippi rivers, and that they were engaged in the transportation of freight among the states and territories, and to and from foreign nations, in that region, but they deny that they owned the only through lines of railroad engaged in that business there; and allege that there were several others, to wit, the Northern Pacific Railroad Company, the Great Northern Railway Company, the Southern Pacific Railroad Company, and the Texas Pacific Railroad Company. They admit that some of them were assisted and encouraged to construct and maintain through competing lines of railroad, independent of each other, by subsidies, land grants, and donations from the United States, and from the people of the various states and territories west of the great rivers. They admit that they entered into the agreement March 15, 1889, and that rules, regulations, and rates of freight have since been fixed and changed by the association thus formed, and that they have complied

with and maintained them. They deny, however, that at the time they entered into the agreement they were dissatisfied with the rates of freight they were receiving. They deny that they intended, in connection with the formation of the association or otherwise, to unjustly or oppressively augment such rates, or to counteract the effect of free competition on prices or facilities of transportation, or to establish or to maintain arbitrary rates, or to prevent any one of the defendants from reducing rates, or to procure unreasonably great sums of money from the people of the states and territories west of the great rivers engaged in interstate commerce. They deny that the formation and operations of the association have had any such effects, but aver that they have tended to decrease rates, and to benefit the people and the roads. They deny that they had any intention by the formation of the association to monopolize or attempt to monopolize the freight traffic of the region affected by it, and deny that it has had any such effect. They allege that they were subject to the provisions of the act of congress of February 4, 1887, entitled, "An act to regulate commerce," and the acts amendatory thereof. They aver that under that act they were required to make all charges reasonable and just; that they were prohibited from making any unjust discriminations, or any undue or unreasonable preferences, or from giving any undue advantages, and that they were required to establish a classification of freight and rates of freight, and to publish and file with the interstate commerce commission schedules showing this classification and these rates, and then to abide by and maintain them; that, in order to comply with this law, consultation between and concerted action of the railroad companies conducting the transportation business west of the great rivers was essential; and that they made this agreement and formed this association in order that they might more effectually comply with the provisions of this law than they could do acting independently. They allege that the rates they have established and maintained have been reasonable and just; that since the organization of the association more than 200 reductions of rates have been made through its action; that their agreement forming the association was filed with the interstate commerce commission under the act, and that the rules, regulations, and rates they have established and maintained have been in strict conformity to the provisions thereof. They deny that the people have been deprived of the benefits which might be expected to flow from free competition in the business of transportation, and allege that the utmost freedom compatible with obedience to the interstate commerce act and with the preservation of the existing agencies of competition prevails, and they insist that their association and action under this contract constitute no combination or conspiracy in restraint of interstate or international commerce.

The opinion filed by the court below when the bill was dismissed is reported in 53 Fed. Rep. 440.

J. W. Ady, for appellant.

George R. Peck and Joel F. Vaile, (A. L. Williams, N. H. Loomis, R. W. Blair, John M. Thurston, O. M. Spencer, C. A. Mosman, J. D. Strong, and W. F. Guthrie, on the briefs,) for appellees.

Before SANBORN, Circuit Judge, and SHIRAS and THAYER, District Judges.

SANBORN, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

Contracts between competing corporations, commonly termed "pooling contracts," to divide their earnings from the transportation of freight in fixed proportions, have long been held void by the courts as against public policy. Such contracts do not simply restrict competition, they tend to destroy it; and, if they do not effect that result, it is only because they do not completely accomplish their

main purpose. When acting independently, the spur of self-interest drives each corporation to furnish the people with the best accommodations and the safest and most rapid transportation at the lowest profitable rates, in order that it may attract larger patronage and gather increased gain. But under the operation of a pool this incentive to exertion is withdrawn. Each carrier finds it to its interest to enhance the price of carriage, and finds that its profits are not sensibly diminished by furnishing poor facilities for transportation and inexpensive and mean accommodations. In 1887 congress recognized and adopted this rule of public policy, and by section 5 of "An act to regulate commerce," commonly called the "Interstate Commerce Act," (24 Stat. 379, c. 104; Rev. St. Supp. 529,) prohibited such contracts between common carriers engaged in interstate or international commerce. That act, however, prohibited contracts for the pooling of freights of different and competing railroads only; it prohibited contracts that thus destroyed competition; it did not prohibit all contracts that in any way restricted or regulated competition. By the act of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," commonly called the "Anti-Trust Act," (26 Stat. 209, c. 647; Rev. St. Supp. 762,) congress provided that:

"Section 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor.

"Sec. 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize, any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a misdemeanor."

"Sec. 4. The several circuit courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of this act."

The government bases this suit on these provisions of the latter act. It claims that the contract in question, and the association formed under it, are illegal on three grounds: First, because the contract prevents free and unrestricted competition between competing lines of railroad; second, because it tends to create a monopoly; and, third, because the railroad corporations have through this contract abandoned the discharge of some of their duties to the public.

The first ground stated is chiefly relied on, and it presents questions of deep interest, the decision of which must have a far-reaching and important influence on the transportation system of the nation. The government does not claim that the contract and association assailed effected a pooling of freights, or that they tend to retard improvement in the facilities afforded for safe, quick, and convenient transportation, or that they are obnoxious to any of the provisions of the interstate commerce act; but it insists that the anti-trust act prohibits all contracts and combinations between competing railroad corporations which in any manner restrict free competition. The argument is, the anti-trust act prohibits any contract between competing railroad companies that restricts com-

petition. This contract restricts competition; therefore it is illegal. Is, then, every contract between competing railroad companies that in any manner imposes a restriction upon competition a "contract in restraint of trade" and illegal within the meaning of the anti-trust act? Is the existence of restriction upon competition the standard by which the legality of these and all other contracts must be measured under that act? and, if not, by what standard shall their legality be determined? These are questions that the position of the government compels us to consider before we can determine whether or not this contract is void. Their determination demands a careful examination and construction of that part of the anti-trust act which declares that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states," is illegal. No definition of these terms is found in this act, but the terms are not new. For more than 200 years before it was passed the courts of England and America had from time to time declared that certain classes of contracts in restraint of trade were against public policy, and therefore illegal and void under the common law. The line of demarcation between these illegal contracts and the innumerable valid agreements that are daily made in the business world had been drawn by long lines of decisions, and had been repeatedly pointed out by the supreme court of the United States. Gibbs v. Gas Co., 130 U. S. 396, 409, 9 Sup. Ct. Rep. 553; Fowle v. Park, 131 U. S. 88, 9 Sup. Ct. Rep. 658. Two years before its passage congress had enacted the interstate commerce law. They had there provided a code of rules and established a commission for the express purpose of regulating that part of interstate and international commerce which relates to transportation. Under these circumstances, three well-settled rules of construction must be applied to ascertain the meaning and scope of the act:

(1) It must be read in the light of all general laws upon the same subject in force at the time of the passage of the act.

(2) Where words have acquired a well-understood meaning by judicial interpretation, it is to be presumed that they are used in that sense in a subsequent statute, unless the contrary clearly appears.

(3) Where congress creates an offense, and uses common-law terms, the courts may properly look to that body of jurisprudence for the true meaning of the terms used, and, if it is a common-law offense, for the definition of the offense if it is not clearly defined in the act adopting or creating it. U. S. v. Armstrong, 2 Curt. 446; U. S. v. Coppersmith, 4 Fed. Rep. 198; In re Greene, 52 Fed. Rep. 104, 111; McCool v. Smith, 1 Black, 459, 469; McDonald v. Hovey, 110 U. S. 619, 628, 4 Sup. Ct. Rep. 142.

Thus we are brought to a consideration of the statutes in force and the decisions that had been rendered when this act was passed to determine what contracts in restraint of trade were then illegal, for it is clear both from the rules to which we have referred and from the title of the act, viz. "An act to protect trade and commerce against unlawful restraints and monopolies," that it was

such contracts, and such contracts only, that congress intended to declare unlawful and criminal in interstate commerce.

Under the common law, the ground on which contracts in restraint of trade were declared unlawful was that they were against public policy. But when it becomes necessary to consider grounds of public policy in the determination of a case, it is well to bear in mind the oft-quoted remarks of Justice Burrough in Richardson v. Mellish, 2 Bing. 252, that public policy "is a very unruly horse, and when you once get astride of it you never know where it will carry you. It may lead you from the sound law." Public policy changes with the changing conditions of the times. It is hardly to be expected that a people who are transported by steam with a rapidity hardly conceived of a century ago, who are in constant and instant communication with each other by electricity, and who carry on the most important commercial transactions by the use of the telegraph while separated by thousands of miles, will entertain precisely the same views of what is conducive to the public welfare in commercial and business transactions as the people of the last century, who lived when commerce crept slowly along the coasts, shut out of the interior by the absence of roads, and hampered by an almost impassable ocean. In 1415 a writ of debt was brought on an obligation by one John Dier, in which the defendant alleged the obligation in a certain indenture which he put forth, and on condition that if the defendant did not use his art of a dyer's craft, within the city where the plaintiff, etc., for half a year, the obligation to lose its force, and said that he did not use his art within the time limited. Hull, J., said: "In my opinion, you might have demurred upon him that the obligation is void, inasmuch as the condition is against the common law; and, per Dieu, if the plaintiff were here, he should go to prison till he paid a fine to the king." Y. B., 2 Hen. V. fol. 5, pl. 26. In 1841, Lord Langdale, master of the rolls, held that a contract made by a lawyer not to practice his profession in Great Britain for 20 years was not against public policy, and that it was valid. Whittaker v. Howe, 3 Beav. 383. In 1843, the court of exchequer held that an agreement not to practice as a surgeon dentist in London or in any other town where the plaintiffs might have been practicing was reasonable and lawful so far as it related to London, but against public policy and void as to the other towns. Mallan v. May, 11 Mees. & W. 652, 667. In 1869, Vice Chancellor James sustained a contract by vendors not to carry on or allow others to carry on in any part of Europe the manufacture or sale of certain kinds of leather so as in any way to interfere with the exclusive enjoyment by the purchasing company of the manufacture and sale thereof, and issued an injunction to enforce it. Cloth Co. v. Lorsont, L. R. 9 Eq. 345. In 1889 the supreme court of New York sustained a contract not to manufacture or sell thermometers or storm glasses throughout the United States for 10 years. Thermometer Co. v. Pool, 51 Hun, 157, 163, 4 N. Y. Supp. 861. And in 1891 the supreme court held that a contract of a railroad corporation giving the Pullman Southern Car Com-

pany the exclusive right to furnish all drawing room and sleeping cars required by that road during a period of 15 years was not an illegal restraint of trade, and sustained it. Chicago, etc., R. Co. v. Pullman Southern Car Co., 139 U. S. 79, 11 Sup. Ct. Rep. 490. It is with the public policy of to-day, as illustrated by public statutes and judicial decisions, that we have now to deal. In considering that subject, we are not to be governed by our own views of the interests of the people, or by general considerations tending to show what policy would probably be wise or unwise. Such a standard of determination might be unconsciously varied by the personal views of the judges who constitute the court. The public policy of the nation must be determined by its constitution, laws, and judicial decisions. So far as they disclose it, it is our province to learn and enforce it; beyond that it is unnecessary and unwise to pursue our inquiries. Vidal v. Girard's Ex'rs, 2 How. 127, 197; Swann v. Swann, 21 Fed. Rep. 299.

Turning first, then, to the decisions, we find that it has long been settled that contracts or combinations of the producers or dealers in staple commodities of prime necessity to the people, to restrict or monopolize their supply or enhance their price, pooling contracts, or combinations between such producers or dealers to divide their profits in certain fixed proportions, and pooling contracts or combinations between competing common carriers, are illegal restraints of trade, and void; while contracts or combinations between employers or workmen to fix and abide by certain prices for labor or services may be valid in their inception, but become illegal restraints of trade whenever the associations formed under them interfere with the freedom of those who are not members to refuse to abide by their prices, or to employ or be employed at other rates, or whenever such associations undertake to prevent nonmembers from using their property or their labor as they see fit. The main purpose of contracts of these classes that are thus held illegal is to suppress, not simply to regulate, competition; and, if suppression is not effected, it is because the contracts fail to accomplish their purpose. It is evident that there is a wide difference between such contracts and those the purpose of which is to so regulate competition that it may be fair, open, and healthy, and whose restriction upon it is slight, and only that which is necessary to accomplish this purpose. It does not necessarily follow that contracts of the latter class constitute illegal restraints of trade because those of the former classes do.

To maintain his proposition that any contract between common carriers that restricts competition in any degree is an illegal restraint of trade, the counsel for the government has cited numerous cases where such expressions as the following are found in the opinions of the courts: "The people have a right to the necessaries and conveniences of life at a price determined by the relation of supply and demand, and the law forbids any agreement or combination whereby that price is removed beyond the salutary influence of legitimate competition." De Witt Wire-Cloth Co. v. New Jersey Wire-Cloth Co., (Com. Pl. N. Y.) 14 N. Y. Supp. 277.

"It is against the general policy of the law to destroy or interfere with free competition, or to permit such interference or destruction." Stewart v. Transportation Co., 17 Minn. 372, (Gil. 348.) "Combinations and conspiracies to enhance the price of any article of trade and commerce are injurious to the public." People v. Fisher, 14 Wend. 9. "Whatever destroys, or even restricts, competition in trade is injurious, if not fatal, to it." Hooker v. Vandewater, 4 Denio, 349, 353. A careful and patient examination of the cases cited, however, discloses the fact that the contracts considered in those cases, which are not of doubtful authority, were of one of the classes to which we have referred, or rest upon some other ground than the existence of restriction upon competition. They were cases involving contracts of competing producers or dealers to limit the supply and enhance the price of, or to monopolize, staple commodities, like Morris Run Coal Co. v. Barclay Coal Co., 68 Pa. St. 173; India Bagging Ass'n v. B. Kock & Co., 14 La. Ann. 168; U. S. v. Jellico Mountain Coal & Coke Co., 46 Fed. Rep. 432; Lumber Co. v. Hayes, 76 Cal. 387, 18 Pac. Rep. 391; De Witt Wire-Cloth Co. v. New Jersey Wire-Cloth Co., (Com. Pl. N. Y.) 14 N. Y. Supp. 277; Salt Co. v. Guthrie, 35 Ohio St. 666; and People v. North River Sugar Refining Co., 54 Hun, 354, 7 N. Y. Supp. 406; or cases involving pooling contracts, like Craft v. McConoughy, 79 Ill. 346; Hooker v. Vandewater, 4 Denio, 349; Stanton v. Allen, 5 Denio, 434; Anderson v. Jett, (Ky.) 12 S. W. Rep. 670; Gibbs v. Gas Co., 130 U. S. 396, 9 Sup. Ct. Rep. 553; Morrill v. Railroad Co., 55 N. H. 531; Denver & N. O. Ry. Co. v. Atchison, T. & S. F. R. Co., 15 Fed. Rep. 650; and Woodruff v. Berry, 40 Ark. 252; or cases involving combinations of workmen which compelled nonmembers to abide by the prices for labor which they had fixed or to abandon their employment, like People v. Fisher, 14 Wend. 9, and U. S. v. Workingmen's Amalgamated Council, 54 Fed. Rep. 994, 1000; or cases where the contracts were ultra vires the corporations, and their purpose and effect was to monopolize trade, like Railroad Co. v. Collins, 40 Ga. 582; Hazlehurst v. Railroad Co., 43 Ga. 13; and W. U. Tel. Co. v. American Union Tel. Co., 65 Ga. 160; or cases of questionable authority, like Com. v. Carlisle, Brightly, N. P. 36, 39. See, contra, Snow v. Wheeler, 113 Mass. 179, 185; Bowen v. Matheson, 14 Allen, 499; Skrainka v. Scharringhausen, 8 Mo. App. 522; and Carew v. Rutherford, 106 Mass. 1, 14. It was natural that in the discussion of contracts of these classes the courts should condemn in unmeasured terms the suppression of competition, but in none of these cases were they required to hold, and in none of them did they hold, as we understand the opinions when read in relation to the facts of the cases respectively, that every restriction of competition by contracts of competing dealers or carriers was illegal. These decisions rest upon broader ground,—on the ground that the main purpose of the obnoxious contracts was to suppress competition, and that they thus tended to effect an unreasonable and unlawful restraint of trade; they rest on the well-settled rules, and come within the well-defined classes, to which we have above referred.

A more extended view of the authorities strengthens this conclusion, and makes plain the line of demarcation which separates legal contracts that incidentally restrict competition from illegal contracts in restraint of trade. The decision in the leading case upon this subject, (Mitchel v. Reynolds, 1 P. Wms. 181, 1 Smith, Lead. Cas. [7th Amer. Ed.] pt. 2, p. 708,) the case which Chief Justice Fuller says is the foundation of the rule in relation to the invalidity of contracts in restraint of trade, (Gibbs v. Gas Co., 130 U. S. 409, 9 Sup. Ct. Rep. 553.) held that a contract that clearly restricted competition was not an illegal restraint of trade. The action was upon a bond the condition of which was that the obligor, who was the assignor of a lease of a bakehouse and messuage in the parish of St. Andrews, Holborn, would not exercise his trade of a baker within that parish for three years. The contract was held valid, and the action sustained. This decision was rendered in 1711. Chief Justice Parker, in delivering it, declared that contracts in partial restraint of trade were valid if made upon sufficient consideration, but that contracts in general restraint of trade were illegal, because they deprived the party restrained of his livelihood and the subsistence of his family, and the public of a useful member. The point actually decided, that contracts in partial restraint of trade may be sustained, has been uniformly approved, but in the development of the law applicable to this subject there has been added to it the further condition that the restriction imposed must be reasonable in view of all the facts and circumstances of each particular case. The remark of Chief Justice Parker that contracts in general restraint of trade are illegal—a remark that was not necessary to the determination of the question before him—has been, to say the least, greatly modified by subsequent decisions. There is a plain tendency in the later authorities to repudiate the proposition that there is any hard and fast rule that contracts in general restraint of trade are illegal, and to apply the test of reasonableness to all contracts, whether the restraint be general or partial. In Tallis v. Tallis, 1 El. & Bl. 391, the court of queen's bench held, in 1853, that a covenant restricting competition, which bound the covenantor not to exercise his trade of a canvassing publisher in London or within 150 miles of the general post office, or in Dublin or Edinburgh, or within 50 miles of either, or in any other town where the covenantee or his successors had an establishment or might have had one within six months preceding, was not an illegal restraint of trade, and enforced it. In Mogul Steamship Co. v. McGregor, Gow & Co., 21 Q. B. Div. 544, certain shipowners engaged in the carrying trade between London and China had formed an association for the purpose of keeping up the rate of freights in the tea trade, and securing that trade to themselves. They accomplished this purpose by allowing a rebate of 5 per cent. on all freights paid by shippers who shipped in their vessels only, and thus partially or entirely excluded the plaintiffs, who were competing shipowners, from the tea-carrying trade. The latter brought suit for an injunction and damages, but, notwithstanding the obvious restriction upon free competition, Lord Coleridge held that the associa-

tion was not an unlawful combination in restraint of trade, and gave judgment for the defendants. This decision was rendered in 1888. It was sustained on appeal, (23 Q. B. Div. 598,) and finally affirmed by the house of lords, (App. Cas. 1892, p. 25.) In Perkins v. Lyman, 9 Mass. 522, the supreme judicial court of Massachusetts held, in 1813, that a contract by a merchant not to be interested in any voyage to the northwest coast of America was not invalid as in restraint of trade. In Match Co. v. Roeber, 106 N. Y. 473, 13 N. E. Rep. 419, a contract of a match manufacturer never to manufacture or sell any friction matches in the District of Columbia, or in any part of the United States except Idaho and Montana, was sustained and enforced. In Navigation Co. v. Winsor, 20 Wall. 64, decided in 1873, a contract between two steam navigation companies engaged in the business of transportation on the riveis, bays, and waters of California, and on the Columbia river and its tributaries, respectively, was declared by the supreme court not to be in restraint of trade, although it prohibited the use of a certain steamer in the waters of California for 10 years. And in 1890 the supreme court of New Hampshire in an exhaustive and persuasive opinion held that contracts by which a railroad corporation leased its road and rolling stock to a competitor for many years were not necessarily against public policy or void at common law, when the purpose of the contracts and combinations did not appear to be to raise the rate of transportation above the standard of fair compensation, or to violate any duty owing to the public by noncompeting companies. Manchester, etc., R. Co. v. Concord R. Co., (N. H.) 20 Atl. Rep. 383. If further authority is wanted for the proposition that it is not the existence of the restriction of competition, but the reasonableness of that restriction, that is the test of the validity of contracts that are claimed to be in restraint of trade, it will be found in Fowle v. Park, 131 U. S. 88, 97, 9 Sup. Ct. Rep. 658; Gibbs v. Gas Co., 130 U. S. 396, 9 Sup. Ct. Rep. 553; In re Greene, 52 Fed. Rep. 104, 118; Horner v. Graves, 7 Bing. 735, 743; Hubbard v. Miller, 27 Mich. 15, 19; Rousillon v. Rousillon, 14 Ch. Div. 351, 363; Cloth Co. v. Lorsont, L. R. 9 Eq. 345, 354; Wickens v. Evans, 3 Younge & J. 318; Ontario Salt Co. v. Merchants Salt Co., 18 Grant, Ch. 540; Mallan v. May, 11 Mees. & W. 652, 657; Whittaker v. Howe, 3 Beav. 383; Kellogg v. Larkin, 3 Pin. 123, 150; Beal v. Chase, 31 Mich. 490; Skrainka v. Scharringhausen, 8 Mo. App. 522, 525; Wiggins Ferry Co. v. Chicago & A. R. Co., 73 Mo. 389; Gloucester Isinglass & Glue Co. v. Russia Cement Co., 154 Mass. 92, 94, 27 N. E. Rep. 1005; Thermometer Co. v. Pool, 51 Hun, 157, 163, 4 N. Y. Supp. 861; Association v. Walsh, 2 Daly, 1; Hodge v. Sloan, 107 N. Y. 244; 17 N. E. Rep. 335; Brown v. Rounsavell, 78 Ill. 589; Jones v. Clifford's Ex'r, 5 Fla. 510, 515.

From a review of these and other authorities, it clearly appears that when the anti-trust act was passed the rule had become firmly established in the jurisprudence of England and the United States that the validity of contracts restricting competition was to be determined by the reasonableness of the restriction. If the main purpose or natural and inevitable effect of a contract was to suppress

competition or create a monopoly, it was illegal. If a contract imposed a restriction that was unreasonably injurious to the public interest, or a restriction that was greater than the interest of the party in whose favor it was imposed demanded, it was illegal. But contracts made for a lawful purpose, which were not unreasonably injurious to the public welfare, and which imposed no heavier restraint upon trade than the interest of the favored party required, had been uniformly sustained, notwithstanding their tendency to some extent to check competition. The public welfare was first considered, and the reasonableness of the restriction determined under these rules in the light of all the facts and circumstances of each particular case.

But it is said that railroad corporations are quasi public corporations, and any restriction upon their competition is against the public policy of the nation. It is not to be denied that there are some expressions to be found in adjudged cases, notably in Gibbs v. Gas Co., 130 U. S. 396, 409, 9 Sup. Ct. Rep. 553; West Virginia Transp. Co. v. Ohio River Pipe Line Co., 22 W. Va. 600, 625; Chicago Gaslight & Coke Co. v. People's Gaslight & Coke Co., 121 Ill. 530, 13 N. E. Rep. 169; and W. U. Tel. Co. v. American Union Tel. Co., 65 Ga. 160,—to the effect that where a business is of such character that it cannot be restrained to any extent whatever without prejudice to the public interests, the courts decline to enforce or sustain contracts imposing such restraint, however partial. But the language employed by the courts in these cases should be read in the light of the circumstances under which it was uttered, and with due reference to the point actually adjudicated. Thus in the earliest of these cases (W. U. Tel. Co. v. American Union Tel. Co.) it was held that a contract between a railroad company and a telegraph company by which the former granted to the latter the exclusive right to construct a telegraph line along its right of way, necessarily excluded all other telegraph lines from the use of a right of way that by condemnation had been devoted to public uses, and was void, because it was in restraint of trade, and tended to create a monopoly. In West Virginia Transp. Co. v. Ohio River Pipe Line Co. it was held that an owner of 2,000 acres of oil land could not grant to one pipe line company an exclusive right to lay a pipe line across said lands, because the legislature, by authorizing pipe line companies to condemn lands for the construction of such lines, had thereby declared that the public had an interest in their construction, and that a contract which precluded such companies from laying a line across an extensive tract of land was necessarily opposed to public policy. In Chicago Gaslight & Coke Co. v. People's Gaslight & Coke Co. the court held that a gas company, which had accepted a charter authorizing it to lay pipes and to supply gas throughout the entire limits of the city, could not disable itself from the performance of the public duty it had undertaken by entering into a contract with another company not to lay pipes and supply gas in a large section of said city. And in Gibbs v. Gas Co. a like contract by one gas company with another to abandon the discharge of public duties which had been devolved upon it by its charter was

held, on that account, to be against public policy, and void, and to be void on the further ground that the contract was in open violation of a statute which prevented the company from "entering into a * * * contract with any other gas company whatever."

No doubt can be entertained that the contract involved in each of the cases last referred to was against public policy for its marked tendency to create a monopoly, and to suppress healthy competition. Two of the contracts were also vicious in the respect that the corporation had attempted to disable itself from exercising powers which had been conferred upon it for the public advantage. But we think, in view of the state of facts on which the decisions were predicated, and the points actually adjudicated, it would be unwise to deduce an unbending rule that any and every contract between two railway companies which enjoins or contemplates concert of action in the matter of establishing freight or passenger rates between competitive points is against public policy, and an unlawful restraint of trade.. No case, we believe, has yet gone to that extent, or has declared that the business of transporting freight and passengers by rail is of such character that no restraint whatever upon competition therein is permissible. On the contrary, contracts between common carriers which imposed some restrictions upon competition have been frequently sustained by our highest courts, and the rule has been often applied that the test of their validity was not the existence, but the reasonableness, of the restriction imposed. Navigation Co. v. Winsor, 20 Wall. 64; Chicago, etc., R. Co. v. Pullman Southern Car Co., 139 U. S. 79, 11 Sup. Ct. Rep. 490; Mogul Steamship Co. v. McGregor, Gow & Co., 21 Q. B. Div. 544; Manchester, etc., R. Co. v. Concord R. Co., (N. H.) 20 Atl. Rep. 383; Wiggins Ferry Co. v. Chicago & A. R. Co., 73 Mo. 389. But even if such an extreme view, as is above indicated, was once tenable, we fail to see how it can well be maintained since the passage of the interstate commerce law, and the action that has been taken thereunder by the government commission which was created to enforce its provisions. The interstate commerce law imposes several important restrictions upon the right of railway companies to do as they please in the matter of making and altering rates, and congress has thereby expressed its conviction that unrestrained competition between carriers is not, at the present time, and under existing conditions, most conducive to the public welfare, but that other things are quite as essential to the public good. Mark the difference in public policy towards merchants and railroad companies exhibited by the common law and by the interstate commerce act. Merchants may refuse to sell their wares at all, they may refuse to transact any business; but railroad companies are common carriers; they must furnish transportation when requested; they must operate their roads or forfeit their franchises; merchants may charge any price they see fit for their wares, but railroad companies are restricted to reasonable and just charges for transportation, (Interstate Commerce Act, § 1;) merchants may sell articles of like character and value for as many different prices

as they have different customers, but railroad companies are restricted to the same charges to all their customers for like services, (Id. § 2;) merchants may give to any customers or any localities any preference or advantage they choose over other customers or localities, but railroad companies are prohibited from giving any undue preference or advantage to any party or place, (Id. § 3;) merchants may sell articles of inferior value for higher prices than those they charge and receive for those of greater value, but railroad companies are prohibited from charging or receiving a greater compensation for a short haul than for a long haul, (Id. § 4;) merchants may keep their prices secret; railroad companies must publish their rates for transportation, and are prohibited from charging or receiving a greater or less compensation than that specified in the published schedules, (Id. § 6;) merchants may change their prices instantly and without notice, railroad companies are prohibited from increasing their rates except after 10 days' public notice or from decreasing them except after three days' public notice, (Id. § 6;) merchants may transact their business free from the supervision or interference of the government; but railroad companies are subject to the supervision of a commission, established by the government, authorized to take the necessary proceedings for the enforcement of these restrictions, (Id. § 12.) These restrictions relate almost exclusively to rates for the transportation of freight and passengers. They are numerous, radical, and effective. They became operative by an act of congress three years before the anti-trust act was passed, and they establish beyond cavil that from that date the public policy of the nation was that competition between railroad companies engaged in interstate commerce should not go wholly unrestricted.

If we turn now to the published reports of the interstate commerce commission, whose opinion on such matters is certainly entitled to great consideration, we find the view even more clearly expressed that it was the purpose of congress to place important restraints upon competition, that uncontrolled struggles for patronage by railway carriers are frequently detrimental to the public welfare, that rate wars are especially injurious to the business interests of the country and contrary to the spirit of existing laws, that the interstate commerce act invites conferences between railway managers, and that concert of action in certain matters by railway companies is absolutely essential to enable it to accomplish its true purpose.

In the fourth annual report of the commission, at page 19, we find the following statement:

"It is thus seen at every turn that the regulation of rates on a consideration of the pecuniary or other situation of any single road, and without a survey of the whole field of operations whereby its business may be affected, and under a supposition that what is done in respect to that road may be limited in its consequences, is entirely antagonistic to all principles of railroad transportation. The railroad managers have perceived this from the very first, and it is because they have perceived this that they have been compelled to organize themselves into railroad associations, for the purpose

of agreeing upon classifications and rates, and upon a great variety of other matters pertaining to the methods of conducting interlocking and overlapping business, and all business affected by competitive forces."

### And on page 21 of the same report the following:

"In former reports the commission has referred to the undoubted fact that competition for business between railroad companies is often pushed to ruinous extremes, and that the most serious difficulties in the way of securing obedience to the law may be traced to this fact. When competition degenerates to rate wars, they are as unsettling to the business of the country as they are mischievous to the carriers, and the spirit of the existing law is against them."

In the second annual report on page 25, when speaking of the unity of railroad interests, the commission uses this language:

"But the voluntary establishment of such extensive responsibility would require such mutual arrangements between the carriers as would establish a common authority, which should be vested with power to make traffic arrangements, to fix rates, and to provide for their steady maintenance, to compel the performance of mutual duties among the members, and to enforce promptly and efficiently such sanctions to their mutual understandings as might be agreed upon."

### And in the same report, on page 23, we find the following:

"A short road may sometimes make itself little better than a public nuisance by simply abstaining from all accommodation that could not by law be forced from it. It would not be likely to do this unless for some purpose of extortion from other roads, but the existence of a power to annoy and embarrass is a fact of large importance. The public has an interest in being protected against the probable exercise of any such power. But its interest goes further than this; it goes to the establishment of such relations among the managers of roads as will lead to the extension of their traffic arrangements with mutual responsibilities, just as far as may be possible, so that the public may have, in the services performed, all the benefits and conveniences that might be expected to follow from general federation. There is nothing in the existence of such arrangements which is at all inconsistent with earnest competition. They are of general convenience to the carriers as well as to the public, and their voluntary extension may be looked for until, in the strife between roads, the limits of competition are passed, and warfare is entered upon. But, in order to form them, great mutual concessions are often indispensable, and such concessions are likely to be made when relations are friendly, but are not to be looked for when hostile relations have been inaugurated."

In the first annual report, on page 33, the commission further said:

"To make railroads of the greatest possible service to the country, contract relations would be essential, because there would need to be joint tariffs, joint running arrangements and interchange of cars, and a giving of credit to a large extent, some of which were obviously beyond the reach of compulsory legislation, and, even if they were not, could be best settled, and all the incidents and qualifications fixed, by the voluntary action of the parties in control of the roads respectively. Agreement upon these and kindred matters became, therefore, a settled policy, and short independent lines of road seemed to lose their identity, and to become parts of great trunk lines, and associations were formed which embraced all the managers of roads in a state or section of the country. To these associations were remitted many questions of common interest, including such as are above referred to. Classification was also confided to such associations, it being evident that differences in classification were serious obstacles to a harmonious and satisfactory interchange of traffic. But what perhaps more than anything else influenced

the formation of such associations, and the conferring upon them of large authority, was the liability, which was constantly imminent, that destructive wars of rates would spring up between competing roads to the serious injury of the parties and the general disturbance of business. Accordingly, one of the chief functions of such associations has been the fixing of rates, and the devising of means whereby their several members can be compelled or induced to observe the rates when fixed."

It would extend this opinion to an unreasonable length if we assumed to state the reasons which probably influenced congress to impose some restrictions upon competition in the matter of railway transportation, and to place railway carriers under the operation of a law which, for its successful execution, as pointed out by the interstate commerce commission, seems to some extent to invite conference and concert of action. It is likewise unnecessary for us to state the reasons why railroad companies should be accorded the privilege of entering into arrangements with other companies which may, to some extent, regulate competition. Reasons to that effect have been stated with great ability and persuasive force in some of the cases to which we have already referred, notably in Manchester, etc., R. Co. v. Concord R. Co., supra. But, without entering into that discussion, it is sufficient to say that, in our judgment, there was no hard and fast rule in force when the anti-trust act was enacted which made every contract between railroad companies void on grounds of public policy if it in any wise checked competition. In our judgment, the more reasonable doctrine then prevailed, especially in view of the recent passage of the interstate commerce act, that such contracts were void, if, judged in the light of all the circumstances and conditions under which they were made, they unreasonably restricted competition.

In view of the foregoing principles, it remains for us to examine the contract which is alleged to be in violation of the anti-trust act, but before doing so a preliminary observation will not be out of place. The anti-trust act is a criminal statute, and it should not be so construed as to subject persons to the penalties thereby imposed unless the contract complained of is one that is clearly within the provisions of the statute. It is also well to note that the case comes before us simply on bill and answer. The bill alleges that its purpose, and that of the association formed under it, was to suppress competition, enhance rates of freight, and monopolize the traffic. The answers deny these averments, and allege that the purpose of the contract and association was to carry into effect the provisions of the interstate commerce act, and to make rates public and steady. The bill alleges that the effect of the contract and association has been to raise the rates of freight above those which the public might have reasonably expected to obtain from free competition. The answers deny this allegation, and aver that the effect has been to maintain reasonable rates, and that more than 200 reductions of rates have been effected through the association. Upon a hearing on bill and answer the averments of fact contained in the bill are overcome by the denials

of the answer, and the averments of fact in the answer stand admitted. Tainter v. Clark, 5 Allen, 66; Brinckerhoff v. Brown, 7 Johns. Ch. 217; Perkins v. Nichols, 11 Allen, 542.

The result is that the government's right to relief here rests upon the contract itself, and the fact that the rates maintained under it have not been unreasonable, and that many reductions have been made under its operation. The ordinary rules of interpretation must then be applied to the language of this contract, and, if it appears that its purpose and tendency were to unreasonably restrict competition, it must be declared illegal. Dillon v. Barnard, 21 Wall. 430, 437; Interstate Land Co. v. Maxwell Land Grant Co., 139 U. S. 569, 577, 11 Sup. Ct. Rep. 656.

In construing the contract it must also be remembered that fraud and illegality are not to be presumed, and that the purpose of the contract is that which is clearly manifest by its terms. In Mitchel v. Reynolds, supra, the unfortunate remark "that whereever such contract stat indifferenter, and for aught appears, may be either good or bad, the law presumes it prima facie to be bad," fell from Chief Justice Parker. This seems to be the reverse of the proposition that every man is presumed to be innocent until he is proved to be guilty. It has long been repudiated by the courts of England and America. The burden is on the party who seeks to put a restraint upon the freedom of contract to make it plainly and obviously clear that the contract is against public policy, and the true rule of construction is that neither fraud nor illegality is to be presumed, but the contract is to be assumed to have been made in good faith for the purpose which appears on the face of it, and not colorably for any other. Registering Co. v. Sampson, L. R. 19 Eq. 462; Tallis v. Tallis, 1 El. & Bl. 391; Rousillon v. Rousillon, 14 Ch. Div. 351, 365; Stewart v. Transportation Co., 17 Minn. 372, 391, (Gil. 348;) Marsh v. Russell, 66 N. Y. 288; Phippen v. Stickney, 3 Metc. (Mass.) 384, 389.

Proceeding, then, to an examination of the contract, we find it to be substantially as follows: In the preamble there is a declaration that the association is formed for "mutual protection by establishing and maintaining reasonable rates, rules, and regulation, both through and local." Article 1 declares that substantially all traffic competitive between two or more members in that part of the United States between the Mississippi and Missouri rivers and the Pacific ocean shall be governed by the association. It is provided by article 2 that the association shall choose a chairman by unanimous vote; that there shall be regular monthly meetings of the association, in which each member must be represented by some responsible officer authorized to act definitely on all questions to be considered; that a committee shall be appointed to establish rates, rules, and regulations for the traffic, and that these shall be put into effect; that any railroad company may give five days' written notice prior to any monthly meeting of any proposed reduction of rates or change of rules, and eight days' notice as to the traffic of Colorado or Utah; that thereupon the reduction or change shall be considered and voted upon by the association at

the next monthly meeting, and all members shall be bound by the decision of the association, "unless then and there the parties shall give the association definite written notice that in ten days thereafter they shall make such modification notwithstanding the vote of the association;" that any member may without notice, at its peril, make any rate, rule, or regulation necessary to meet the competition of outside lines, subject to a liability to pay a penalty of $100 if the association decides by a two-thirds vote that the rate, rule, or regulation was not necessary for that purpose; that all arrangements with connecting lines for the division of through rates relating to traffic covered by the agreement shall be made by authority of the association, and that the chairman of the association shall punish violations of the agreement by fines not exceeding $100 in any case.    Article 3 makes the chairman the executive officer of the association, requires him to publish and furnish to the members of the association the rates, rules, and regulations established, and all changes in them, and requires him to enforce the provisions of the contract.    Article 4 prohibits under-billing or billing at a wrong classification.    Articles 5 and 6 provide for the appointment of the necessary employes and the payment of the necessary expenses of the association.    Article 7 provides for arbitration in case the managers of the parties to the agreement fail to agree upon any question arising under it; and article 8 provides that any member may withdraw from the association on 30 days' notice.

It is obvious at a glance that this agreement is not affected by any of the vices of an ordinary pooling contract. " The income of each member of the association under the terms of the agreement is still measured by the amount of freight and the number of passengers it carries, and it is still to the interest of each member of the association to make that patronage as great as possible, by affording to the public superior facilities for safe, speedy, and convenient transportation.    Under the operation of the agreement, each company must still compete with its associate members in the character of its roadbed, quality of its equipments, length of route, convenience of its terminal facilities, and in the efficiency of its management, for all of these considerations will necessarily have a marked influence upon the amount of its patronage.

In other of its features, also, the contract is not subject to criticism.    In these days, when persons engaged in many other callings and avocations are in the habit of meeting at intervals, as associations, for the purpose of cultivating more friendly relations and establishing regulations conducive to the general welfare of the trade, it is difficult to see upon what just grounds representatives of railway companies can be denied the right of forming associations for the purpose of friendly conference and to formulate rules and regulations to govern railway traffic. The fact that the business of railway companies is irretrievably interwoven, that they interchange cars and traffic, that they act as agents for each other in the delivery and receipt of freight

and in paying and collecting freight charges, and that commodities received for transportation generally pass through the hands of several carriers, renders it of vital importance to the public that uniform rules and regulations governing railway traffic should be framed by those who have a practical acquaintance with the subject, and that they should be promulgated and faithfully observed. The advisability of establishing such rules and regulations in the mode above indicated, particularly for the uniform classification of freight, has been frequently pointed out in the reports of the interstate commerce commission. Indeed, the benefits that would result from uniform rules and regulations, and from uniformity in the classification of freight, seem to us so obvious that we need not stop to enumerate them.

We are of the opinion, therefore, that the stipulations of this agreement enjoining a monthly conference between representatives of the various members of the association, and the appointment of a committee to formulate rules and regulations governing the traffic embraced by the agreement, are not only not opposed to public policy, but, if faithfully carried out, will tend to promote the public interests. It is also obvious, we think, that the stipulation requiring five days' written notice of a proposed reduction in rates does not, in and of itself, render the contract unlawful. It is certain that a contract not to reduce established rates without a public notice of three days, and not to increase them without a notice of ten days, would not be against public policy, because the interstate commerce act has prohibited such changes with less notice. The plain object of this provision was to prevent competitors from resorting to secret, unfair, and ruinous methods of warfare, to make competition fair and open, and to enable shippers to modify their action to suit the coming changes. There is no purpose of the provision, or of the policy that dictated it, that would not be as well, if not better, served by a notice of fifteen or forty days, as one of three days.

But it is urged that the contract in question restrains competition in rates, and is therefore unlawful. That it does have some tendency to check competition in that respect will not be denied; but that the restraint imposed is slight, that there is abundant room within the terms of the agreement for the play of all the healthy forces of competition, and that it has a pronounced tendency to prevent sudden and violent fluctuations in rates, commonly termed "rate wars," seems to us to be equally manifest. It is not reasonable to suppose that any member of the association which, by virtue of its situation, can really afford to transport freight or passengers between any two competitive points for a substantially less sum than its competitors, will be likely to forego the advantage that its situation gives it, even under the operation of the agreement. It is much more probable that under the operation of the agreement, as under the influence of free competition, the rates between competitive points will be largely, if not entirely, based upon the rate which the road having the shortest line and best facilities esteems fair and reasonable compensation.

It will be observed that under the terms of the agreement no member of the association has bound itself to be governed by a rate fixed by a vote of the majority for a longer period than 10 days after the monthly meeting next succeeding its notification of a proposed change in rates; and for that reason the limitation imposed by the contract upon the right of a member of the association to adopt such a rate as it sees fit is very slight, and the power reposed in the association is correspondingly small. We fail to see, therefore, that the natural or probable effect of this contract will be to sensibly raise either freight or passenger rates above the level which they would attain under the influence of what is termed "unrestricted competition." On the other hand, it seems highly probable that the contract in question will prevent sudden and violent fluctuations in freight rates, such as often upset the business calculations of entire communities, and that this was one of the main reasons which led to the formation of the association. We are also persuaded that it will have a sensible tendency to induce a more uniform system of classification throughout the great region where the association operates, and also to induce the establishment of a more perfect code of rules and regulations governing freight traffic. It may also tend to prevent stealthy, secret, and unfair methods of warfare, and to make the strife for patronage among the members of the association open, fair, and honorable. All of these are objects that are in line with the true spirit of the interstate commerce act and an intelligent public policy.

The result is that this contract, in view of all the circumstances of the case and the situation of the parties thereto, does not impose such unreasonable restraints on competition as will warrant us in holding that it is one of those contracts or conspiracies in restraint of trade and commerce among the several states which fall within the inhibition of the anti-trust act of July 2, 1890.

Nor is there any monopoly of trade, or any attempt to monopolize trade, within the meaning of that act, evidenced by this contract. So far as can be learned from it, the association has never intended to have, and never has had or attempted to have, any trade. It has not held or attempted to obtain or hold any property except the moneys necessary for the bare expenses required to pay its officers and employes. It has been and is a mere adviser with its members upon disputed questions submitted by the contract to its consideration. So far as can be learned from the contract, each member of the association is striving with every other in its territory, whether a member of the association or not, to divert from the latter and gather to itself all possible trade. There are provisions in the contract that the chairman may authorize members to meet the rates of competitors who are not members of the association, and that any member may meet the rates of such a competitor at its peril; but these provisions were necessary for the protection of members of the association against the attacks of nonmembers. Without such provisions unreasonably low rates established by the latter would draw away the busi-

ness of the members, and deprive them of the opportunity to compete on equal terms. These provisions give no company any higher right or greater power than it had before the contract was made, but simply reserved to each the privilege of exercising its original right to meet competition without giving the 15 days' notice in case of a warfare upon it by a nonmember.

A monopoly of trade embraces two essential elements: (1) The acquisition of an exclusive right to, or the exclusive control of, that trade; and (2) the exclusion of all others from that right and control. There is nothing in this contract indicating any purpose or attempt to obtain such a monopoly. The great transportation systems of the Great Northern Railway Company, the Northern Pacific Railroad Company, the Southern Pacific Railroad Company, and the Texas Pacific Railroad Company were operated in the region subject to the regulation of this association, but none of these companies were members of it; and, even if they had been, there would still have been no evidence of any attempt to monopolize trade here, because each member is left to compete with every other for its share of the traffic. In re Greene, 52 Fed. Rep. 104, 115.

The position that these railroad companies have so far disabled themselves from the performance of their public duties by the execution of this contract as to give ground for the avoidance of the contract, and for a forfeiture of their franchises, cannot be successfully maintained. It is well settled upon principle and authority that, where a corporation by a contract entirely or substantially disables itself from the performance of the duties to the public imposed upon it by the acceptance of its charter, the contract is void, and its franchise may be forfeited. The reasons for this rule, and some of the limitations of it, were stated by this court in Union Pac. Ry. Co. v. Chicago, R. I. & P. Ry. Co., 51 Fed. Rep. 309, 317–321, 2 C. C. A. 174, 230–235; and it is unnecessary to repeat them here. It goes without saying that this rule in no way limits the power of a corporation to discharge its duties through agents of its own selection. There is no doubt that each of these corporations could lawfully appoint an expert or a committee of experts upon the subject of classification and rates of freight upon its road, empower him or them to fix the rates, and then maintain them for 40 days unchanged. Practically the 15 representatives of these companies, at a meeting of the association, their chairman, and their committee that originally fixed the rates and rules, together constitute an advisory committee on rates and rules of traffic, composed of men whose intimate knowledge of the needs of the shippers, and of the character and quantities of the commodities transported through the different portions of the wide area traversed by these railroads, and whose wide experience in the effect of various rates upon the accommodation of the public and the business of the companies fit them well to carefully consider and wisely establish just and reasonable rates throughout this territory. Such a committee each company acting independently might have appointed, and it is not per-

ceived that the fact that two or more companies appoint the same men to establish rates and rules for the traffic upon their respective roads in any way invalidates the appointment of either.

Moreover, the power delegated to the association, its committee and chairman, is so limited in extent and so restricted in time that it is hardly worthy of serious consideration as the ground for the avoidance of a contract and the forfeiture of a franchise. The power granted to the committee originally chosen to establish the rates and rules expired by limitation upon a 30-days notice of withdrawal from the association; the power of the association itself to prevent modifications and changes in the rules and rates established ceases after 15 days' notice of an intention to make the modifications and changes notwithstanding its action. It is true that there is a provision in the second article of the agreement that regular meetings of the association shall be held, "unless notice shall be given by the chairman that the business to be transacted does not warrant calling the members together," but the remark of the counsel for the government that this gives the chairman power to prevent the consideration of proposed changes in rates, and thus to maintain them indefinitely by preventing a meeting of the association, cannot be seriously considered. The effect of the contract is that, when a company gives notice of a proposed change of any importance, the meeting shall be held. Such a notice presents business to be transacted that does warrant calling the members together. If, under such circumstances, the chairman gives notice that there is no such business, he violates the contract. The presumption is that he will not violate it; and, if he does do so, that is no ground for an avoidance of the contract.

The result is that neither this contract nor the association formed under it can be held to be obnoxious to the provisions of the anti-trust act in view of the facts admitted by the pleadings in this suit, and in the absence of other evidence of their consequences and effect.

Many of the considerations to which we have referred are presented upon the argument of the question whether or not the anti-trust act applies to or in any way governs transportation companies that are engaged in that part of interstate and international commerce which consists solely of the transportation of persons and property, in view of the very substantial regulation of this part of commerce provided by the interstate commerce act. The views we have expressed render it unnecessary to determine this question, and we express no opinion upon it. We rest this decision on the ground that, if the anti-trust act applies to and governs interstate and international transportation and its instrumentalities, the contract and association here in question do not appear to be in violation of it.

The decree below is affirmed, without costs.

THAYER, District Judge, concurs.

SHIRAS, District Judge, (dissenting.)   I am unable to concur in the conclusion reached by the majority of the court in this case, and propose to state the reasons for such nonconcurrence.

Assuming that the anti-trust act of July 2, 1890, is applicable to interstate railroad companies and the business transacted by them, it seems to me entirely clear that the contract entered into by the railway companies forming the Trans-Missouri Freight Association is in contravention of the statute, in that it deprives the public of the benefit of free competition between the associated railway companies, and thereby subjects the commerce of the regions tributary to these lines of railway to the possibility, if not the certainty, of paying increased rates for the transportation of freight over the same.

It is doubtless entirely true that at the present time a more liberal rule prevails than in the earlier days in regard to contracts affecting the business carried on by private citizens or corporations, when the same is essentially of a private nature, and only indirectly affects the public at large.   As is pointed out in the opinion of the court, the use of steam and electricity in connection with the mercantile and commercial business of the world has so greatly increased the facilities for commercial intercourse that contracts which a century ago would have been in fact an unreasonable restriction upon trade in its then condition would not now produce the same result, and hence would not fall within the condemnation of the principle which declares unlawful all contracts or combinations which work an unreasonable restriction upon trade and commerce.   The principle itself, however, remains in force at the common law even in regard to business enterprises which deal only with matters of private interest, and only incidentally affect the community at large.   At an early day a distinction was recognized at the common law between the rules applicable to business pursuits of a purely private nature and those connected with matters directly affecting the community at large; as, for instance, the dealing in commodities forming the necessaries of life.   Contracts or combinations tending to create a monopoly in the latter articles were condemned as contrary to public policy, when like contracts affecting other kinds of property were held to be valid; and the same principle holds good at the present time.   Another distinction which is now firmly established and enforced grows out of the nature of the business contracted about, and the relation the contracting parties bear thereto.   An individual or a private corporation engaged in a purely private enterprise may lawfully enter into contracts or combinations in regard thereto which would be invalid and illegal if the business was of a public nature, and the corporation was created for the purpose of engaging therein.   Thus in Gibbs v. Gas Co., 130 U. S. 396, 9 Sup. Ct. Rep. 553, the supreme court, speaking by Mr. Chief Justice Fuller, declared that—

"The supplying of illuminating gas is a business of a public nature to meet a public necessity.   It is not a business like that of an ordinary corporation engaged in the manufacture of articles that may be furnished by individual

effort. * * * Hence, while it is justly urged that those rules 'which say that a given contract is against public policy should not be arbitrarily extended so as to interfere with the freedom of contract, (Registering Co. v. Sampson, L. R. 19 Eq. 462,) yet in the instance of business of such character that it presumably cannot be restrained to any extent whatever without prejudice to the public interest, courts decline to enforce or sustain contracts imposing such restraint, however partial, because in contravention of public policy. This subject is much considered, and the authorities cited, in West Virginia Transp. Co. v. Ohio River Pipe Line Co., 22 W. Va. 600; Chicago Gaslight & Coke Co. v. People's Gaslight & Coke Co., 121 Ill. 530, 13 N. E. Rep. 169; Western Union Tel. Co. v. American Union Tel. Co., 65 Ga. 160. * * * Innumerable cases, however, might be cited to sustain the proposition that combinations among those engaged in business impressed with a public or quasi public character, which are manifestly prejudicial to the public interest, cannot be upheld."

In West Virginia Transp. Co. v. Ohio River Pipe Line Co., 22 W. Va. 600, it is said:

"If there be any sort of business which from its peculiar character can be restrained to no extent whatever without prejudice to the public interest, then the courts would be compelled to hold void any contract imposing any restraint, however partial, on this peculiar business, provided, of course, it be shown clearly that the peculiar business thus attempted to be restrained is of such a character that any restraint upon it, however partial, must be regarded by the court as prejudicial to the public interest."

In Chicago Gaslight & Coke Co. v. People's Gaslight & Coke Co., 121 Ill. 530, 13 N. E. Rep. 169, it is declared that—

"The ordinary rule that contracts in partial restraint of trade are not invalid does not apply to corporations like appellant and appellee, because they were engaged in a public business, and in furnishing that which was a matter of public concern to all the inhabitants of the city."

It is not necessary to extend the citation of authorities upon this general proposition, but it is of vital importance to bear in mind the distinction that exists in this particular between private individuals or corporations engaged in ordinary business avocations and public corporations engaged in the performance of a public or governmental duty, like that of building and operating a public highway in the form of a railway line.

From the earliest days the duty of constructing and maintaining the public roads of a country has been recognized as one incumbent upon the government. To secure the construction of a railway running over the property of many individuals, the right of eminent domain must be called into exercise, and thus the character of a public enterprise is impressed upon it both by reason of the purpose it is intended to subserve and by reason of the governmental power exercised in its creation and maintenance. So, also, corporations created for the purpose of building and operating public highways in the form of railroads are of necessity public, not private, corporations, because they are formed for the purpose of engaging in the public work of constructing and operating a highway for the use of the people at large, and because they are authorized to call into exercise the governmental right of eminent domain, a right which cannot be lawfully conferred upon a private corporation engaged solely in enterprises private in their nature. The failure to recognize the distinction existing between private enterprises

carried on by individuals or private corporations, and public duties performed through the agency of public corporations, in my judgment has misled the court in reaching the conclusion announced in the majority opinion.

As applied to private associations, the modern authorities undoubtedly sustain the proposition therein laid down, "that it is not the existence of the restriction of competition, but the reasonableness of that restriction, that is the test of the validity of contracts that are claimed to be in restraint of trade;" but that, in my judgment, is not the test of validity when the action of public corporations relative to public duties is brought in question.

Parties engaged in the manufacture or sale of lumber, dry goods, or other like articles primarily owe no duty to the public in connection therewith. They may limit or enlarge, continue or discontinue the business, as they please, and may charge exorbitant prices or the contrary. In these particulars they owe no special duty to the public, for they are not exercising any sovereign or public powers in carrying on such private enterprises, nor are they charged with the performance of a public duty. Hence they are at liberty to enter into contracts with other private parties engaged in like pursuits which may tend to regulate or restrict the business carried on by them, subject, however, to the rule that restrictions unreasonably affecting the freedom of trade and commerce cannot be sustained, because thereby the public interests are affected. Touching contracts between private parties in regard to pursuits essentially private in their nature, the test of validity we thus find to be the actual effect thereof on the public welfare. In regard to such private enterprises the public has no voice in the management thereof, nor any right of dictating what shall or shall not be done by the owners thereof, nor have the latter become bound to carry on the business in the interest or for the benefit of the public primarily. The contrary is true with regard to public corporations, clothed with the power to fulfill public duties, and engaged in enterprises the purpose of which is to discharge a governmental duty, and which require in their performance the exercise of the sovereign right of eminent domain.

Such public corporations owe primarily a duty to the community, and the relations existing between them and the public are in many particulars radically different from those pertaining to private corporations. Neither extended argument nor the citation of authorities is needed to show that the business of railway transportation is one of a public character, and which reaches and affects the business interests of the entire community. When a highway in the form of a railroad is constructed and put in operation, all parties living in the regions adjacent thereto are dependent upon the railroad for the carrying on of all business which involves the transportation of persons or property in connection therewith. The farmer is compelled to use the railway for the transportation of the products of his farm to market. The merchant must use the same agency in bringing to his place of business the merchandise in which he deals. Practically the business of the community, whether

in connection with articles of prime necessity, like food or fuel, or the other articles which are produced or dealt in by the people at large, becomes of necessity wholly dependent upon the facilities for transportation furnished by the given railway.  As to the majority of the community living along its line, each railway company has a monopoly of the business demanding transportation as one of its elements.  By reason of this fact the action of the corporation in establishing the rates to be charged largely influences the net profit coming to the farmer, the manufacturer, and the merchant from the sale of the products of the farm, the workshop, and manufactory, and of the merchandise purchased and resold, and also largely influences the price to be paid by every one who consumes any of the property transported over the line of railway.  There is no other line of business carried on in our midst which is so intimately connected with the public as that conducted by the railways of the country.

Certainly, if it be true, as held in Gibbs v. Gas Co., supra, that the supplying of gas for illuminating purposes is a business of a public nature, because it supplies a public necessity, and that it is of such a character that contracts between companies engaged therein, looking to a regulating of competition, cannot be sustained because inimical to the public welfare, then it must also be true that the furnishing facilities for the transportation of the products of the country by means of railways is likewise a public business, and one of such character that contracts or combinations between the corporations engaged therein, intended to limit the effect of free competition upon the rates charged the public, must be held to be prejudicial to the public interests, and therefore to be invalid.  It is said in the opinion of the court that—

"We find that it has long been settled that contracts or combinations of producers or dealers in staple commodities of prime necessity to the people, to restrict or monopolize their supply or enhance their price, pooling contracts or combinations between such producers or dealers to divide their profits in certain fixed proportions and pooling contracts or combinations between competing common carriers, are illegal restraints of trade, and void."

Are not railway companies engaged in the transportation of articles of prime necessity to the people?  Do they not handle the food products of the country, the fuel, and all the other necessaries of life?  Do not the rates charged for the transportation of these articles have as much to do with determining the prices paid by the community as the rates charged by those engaged in buying and selling the same upon the open market?  If combinations among the dealers in such articles to avoid competition and enhance the cost to the consumer are illegal and void, why are not combinations among common carriers engaged in the transportation of the same articles, tending to enhance the cost to the consumer by avoiding the effect of competition upon the rates of transportation, equally void?

If I correctly understand the opinion of the majority, it is therein admitted that it is the settled law that contracts or combinations between producers or dealers in staple commodities of prime neces-

sity to the people, tending to monopolize the supply or enhance the price, are contrary to public policy and therefore void; and yet it is maintained that public corporations like railway companies may combine to fix the rates to be charged for the transportation of the like commodities, which of necessity affects the cost to the consumer, as well as the value to the producer, and that contracts thus arbitrarily establishing the rates to be charged, and avoiding the effect of competition thereon, cannot be held to be invalid, unless it be clearly shown that the rates thus fixed are unreasonable. It seems to me the two propositions are clearly at variance.

The right to freely contract and combine possessed by private parties engaged in private pursuits is limited and denied when they come to deal with staple commodities, because the whole community is interested in these articles of prime necessity, and any contract affecting them affects the public; and clearly public corporations are under a more stringent rule in this particular.

Unlike private parties engaged in private pursuits, which only incidentally, if at all, affect the public welfare, corporations created for the purpose of constructing and operating the modern form of public highways owe primarily a duty to the public. They are created to subserve a public purpose, to wit, to furnish the means for the transportation of the people and property of the country, and they are under constant obligation to use their corporate powers in the interest of and for the benefit of the community from which these powers have been derived.

The right to demand transportation for one's self or property over such highways belongs to every member of the community, and the rate to be paid for such service is a question which affects every one using the highway, and, in addition, every member of the community is affected by the rates charged, for the amount thereof enters into and affects the price of every article that is bought and sold in the community. The duty of transporting persons and property over a line of railway is a public duty, assumed by the corporation operating the particular line, and in the proper performance thereof the public has a direct interest. The proper performance of this duty includes the rate of compensation to be charged for the services rendered, and this is a question in which the public has a direct and most important interest, and all contracts or combinations intended to affect the rate to be charged directly affect the public welfare. Clearly, therefore, railway transportation of persons and property comes within the classes of business, which, in the language of the supreme court in Gibbs v. Gas Co., supra, are of such a public character that presumably they cannot be restrained to any extent whatever without prejudice to the public interest.

In the opinion of the majority it is practically assumed that the same freedom to contract or combine with others is possessed by the public corporations engaged in railway transportation as belongs to private parties engaged in private pursuits. It does not so seem to me, either upon principle or authority. Private corporations are not created for the primary purpose of furthering the public

interests, nor do they assume the performance of a public duty. Conducting private enterprises for private gain, there is no presumption that their acts will affect the public welfare, and hence their freedom of contract and action is not to be limited or denied, unless it clearly appears that the interests of the community will be injuriously affected by the action proposed to be taken. On the other hand, in the case of public corporations engaged in carrying on a public enterprise, it is apparent that every course of action intended to affect the business transacted by the corporation must of necessity affect the public interests.

A railway corporation engaged in the transportation of the persons and property of the community is always carrying on a public business, which at all times directly affects the public welfare. All contracts or combinations entered into between railway corporations, intended to regulate the rates to be charged the public for the service rendered, must of necessity affect the public interests. By reason of this marked distinction existing between enterprises inherently public in their character and those of a private nature, and further by reason of the difference between private persons and corporations engaged in private pursuits, who owe no direct or primary duty to the public, and public corporations created for the express purpose of carrying on public enterprises, and which, in consideration of the public powers exercised in their behalf, are under obligation to carry on the work intrusted to their management primarily in the interest and for the benefit of the community, it seems clear to me that the same test is not applicable to both classes of business and corporations in determining the validity of contracts and combinations entered into by those engaged therein.

In the case of railway companies engaged in the public business of transporting persons and property from state to state over the highways of the country, it is, in my judgment, clearly contrary to the public welfare, and therefore illegal, for these public corporations to enter into contracts and combinations intended to limit or nullify the effect of free and unrestrained competition upon the rates to be charged the public for the services rendered in the transportation of persons or property over the public highway. So far as the national government has dealt with this question, it has as yet not undertaken to declare by statute what rates shall be charged by the railway companies, nor has it established a fixed maximum or minimum limit. In this particular the public has relied upon the effect of competition in keeping the rates charged within reasonable bounds. Hence it is that all sections of the country have so eagerly striven to secure the construction of competing lines of railway. There is scarcely a town or city in the community that has not felt the need of securing access to rival lines of transportation, in order that it might enjoy the benefits of competition in reducing the freight and passenger tariffs of the railway companies. If, after a community has by donations or taxation expended a large sum in securing the construction of a second line of railway for the purpose of thereby enjoying the benefits of competition, it is open to the two railway corporations to combine together, and by contract

establish a tariff of rates which neither company is at liberty to depart from, it is clear that the community is thereby deprived of its only protection against unfair charges.

In my judgment, the community is absolutely entitled to the protection against unfair rates which is afforded by free and unrestrained competition between the companies engaged in the transportation business of the country, and any contract or combination which is intended to restrict competition in this particular is inimical to the public welfare, and is therefore illegal.

In the opinion of the majority of the court it is urged, in substance, that it is lawful to place a reasonable restriction upon competition, and that, therefore, the question in each case is whether the restriction placed upon competition results in the imposition of unreasonable rates for the services rendered. This is the rule in regard to private parties engaged in private pursuits, because as to such pursuits a restriction upon competition does not affect the public unless it is unreasonable, and the public has no right of complaint until its interests are unfavorably affected; but, as I have endeavored to maintain, in the case of public railway corporations, the work they are engaged in is inherently of a public nature, and any contract or combination entered into between them, intended to affect the rates to be charged, must of necessity affect the entire community. In view of the public interest in the rates charged for transportation over the public highway, and in the absence of legislation affording other means of protection, the community cannot be deprived of the safeguard secured by free and unrestricted competition between the different lines of railway without placing the welfare of the public in subjection to the interests or supposed interests of those managing these corporations, which certainly cannot be lawfully done.

But it may be argued that due protection in this particular is afforded by holding that reasonable restriction upon competition as to rates will be sustained, and unreasonable restrictions will be held invalid. I apprehend that no other meaning can be given to this proposition than that, if the rates established under a given restriction upon competition are reasonable, then they will be sustained; otherwise not. The reasonable rates which the community is entitled to enjoy are those which result from free and unrestrained competition, and not those which are agreed upon by the railway companies in the absence of competition. In the absence of legislation establishing a standard for reasonable rates, and in the absence of rates fixed by free competition, what practicable criterion is there for determining whether a tariff of rates agreed upon by railway companies is or is not reasonable with reference to the public? If it be the law that railway companies may combine together, and by contract agree upon the schedule of rates to be charged, and bind themselves under penalties not to depart from the schedule thus established, and if the individual citizen can obtain no relief against the exaction of rates thus fixed, unless he can in each instance prove to a court and jury that the rate charged is unreasonable, then he is in fact wholly without remedy. The great

cost and other evils of litigation of this character would ordinarily deter the private citizen from the effort to maintain his rights by an appeal to the courts.

But if the citizen should assume these burdens, and should contest the rightfulness of the charges complained of, he would, under the view advanced in the majority opinion, be compelled to establish by competent evidence that the rate complained of was unreasonable. By what criterion is the question of the reasonableness of the rate charged to be determined? The article shipped is perhaps a car load or two of live stock or of wheat or other like products. Is the citizen to be compelled to attempt to prove what it really costs the railway company to transport these cars? Is the inquiry to embrace an investigation into the cost of the construction of the road, of the equipping the same, and of operating the road on the one hand, and into the total amount and character of the business done by the road, and of the amounts received therefrom, so as to ascertain whether a due relation exists between the income and expenditure? It must be apparent to any one that it would be wholly impracticable to enter upon such an investigation, and, if it was entered upon, the citizen would be at such a disadvantage as to amount to a total denial of justice to him.

If it be said that the reasonableness of the rate charged is to be ascertained by comparison with the rates charged for like services by other railroads, then the rates accepted as the standard of comparison must be such as are the result of free competition, because it would not do to accept as a standard rates fixed by a combination, for it could not be known that these rates are reasonable, and the proposed standard would be without value as evidence. The difficulties that would of necessity be encountered by any citizen in establishing the unreasonableness of a particular rate charged him are such as to render a remedy by that method of no value, and hence it is that at all times the citizen is entitled to the protection afforded him by absolutely free competition between railway companies. Any contract or combination which tends to deprive the citizen of the protection thus afforded him is contrary to public policy.

In the opinion of the majority a very full and careful analysis is made of the various provisions of the contract entered into by the defendant companies, and the benefits to be derived therefrom are pointed out. I do not doubt that in many respects the provisions of this contract, if carried out, would operate beneficially for the companies and without injury to the public; but the illegality of the contract, in my judgment, lies in the fact that its main purpose is to protect the companies from the effects of free competition in reducing the rates to be collected for the transportation of freight over the lines of railway operated by the contracting corporations. Certainly the defendants, if they considered themselves bound by this agreement, were no longer at liberty to compete with each other in the matter of rates to be charged the public.

The rates are to be established by a committee, and are to be observed by all the contracting parties, with a liability to a penalty for any breach of the contract. It is clearly evident that the defendants entered into this contract in the expectation that thereby a schedule of rates would be fixed which would differ from those which would prevail in the absence of such concerted action.

The several companies are no longer left free to fix rates based upon considerations pertaining to their own lines of railway, the cost of operating the same, and the facilities possessed for handling the business. If the making and enforcement of this contract would not have the effect of establishing a schedule of rates other and different from what would obtain in the absence of the contract, what induced the companies to enter into it?

I can place no other construction upon this contract than that its main object was to remove the question of rates from the field of competition. In my judgment, it is not necessary to enter upon a minute examination of the averments made in the bill and denied or admitted in the answer. The bill charges and the answer admits that the defendant companies entered into the contract in question, and the main issue in controversy is as to the validity of the contract. As I construe it, the invalidity thereof is apparent upon its face, in that it clearly appears that the purpose of the contract was to establish by agreement a schedule of rates which was to bind all the contracting companies, and which each company was bound to enforce as against its patrons; thus depriving the public of the protection resulting from free and unrestrained competition between these public corporations. It matters not that the particular rates now enforced under this contract may be wholly reasonable. That is not the question. The point to be decided is whether these public corporations, engaged in a public enterprise, have the right to agree that they will cease to compete with each other.

Whether these corporations shall or shall not be relieved from the effects of free and fair competition in the carrying on of the public work they are engaged in is a question to be decided by the people, acting through the proper governmental agency. It is not for the railway companies to decide when they will compete with each other and when they will not. The public welfare demands that they should remain always subject to the operation of this principle of free competition, unless they are freed therefrom by legislative action, whereby other safeguards are substituted for that afforded the public by the operation of the principle named.

If I correctly apprehend that portion of the majority opinion which deals with the effect of the interstate commerce act, it is therein argued that this act radically changes the rights of the railway companies and the public in this particular, and that it was intended thereby to free the companies from the effects of free competition. With all due deference to my brethren, I must yet be permitted to say that it seems to me that the opinion always

loses sight of the distinction existing at the common law between parties following private pursuits and public corporations engaged in public enterprises.

The interstate commerce act did not materially change the rights pertaining to the public. It created certain machinery for the better enforcement and protection of the public interests, but the rights to be protected were already in existence, and the statute in this respect is only declaratory of common law principles. Before the enactment of that statute, railway companies were recognized to be public corporations, charged with the duties and obligations pertaining thereto. As common carriers they were under legal obligation to deal with the public, and to afford equal facilities to every citizen, and they were only entitled to demand reasonable, and not exorbitant, compensation for the services rendered by them. The purpose of the interstate commerce act was not so much to change the legal rights of the common carriers and of the public as it was to compel a change in the practices of the railway companies, and to enforce compliance on their part with the duties and obligations which rested upon them under the principles of the common law. The line of argument followed by the majority seems to assume that the main purpose of the interstate commerce act is to regulate the relations between the competing lines of railway, and to protect the weaker lines of railway and the capital invested therein from being absorbed by the stronger competitor. That there are evils of this nature of great magnitude is not to be denied, but the interstate commerce act was not enacted for their eradication.

The primary purpose of that act was to deal with the relations existing between the common carriers and the public, and to enforce the rights of the latter. Experience had shown that railway companies had, in many instances, favored particular localities or particular parties or particular classes of business at the expense of the community at large, and the act was, in the language used by the supreme court in Railway Co. v. Goodridge, 149 U. S. 680, 13 Sup. Ct. Rep. 970, intended "to cut up by the roots the entire system of rebates and discriminations in favor of particular localities, special enterprises, or favored corporations, and to put all shippers on an absolute equality." The uniformity and equality of rates sought to be secured by that act are not between the schedules of rates charged by the several companies, but between the charges actually made by each railway company to its patrons. The act does not require the schedule of rates adopted by one company to conform to that of a rival company. What it does demand of each company is that, in dealing with its customers, it shall make no unjust discrimination, but shall, for the like service performed under similar circumstances, charge the same rate to all. The act provides that all charges for the transportation of persons or property from state to state shall be reasonable and just, but no standard for ascertaining whether a given rate is reasonable or not is established by the act.

I fail, therefore, to perceive the force of the argument that the

adoption of the interstate commerce act worked a radical change in the relations existing between railway companies and the public, and that one effect thereof was to authorize the former to combine together for the purpose of escaping the effect of competition upon the rates to be charged the public for the services rendered. Before the adoption of that act the community was certainly entitled to the protection derived from free competition between the lines of railway engaged in interstate traffic, and there is nothing in that act which deprives the public of this safeguard. That act was intended to secure to the public the enjoyment of the pre-existing right to reasonable rates upon interstate commerce, and to defend the public against the evils resulting from unjust discrimination on behalf of favored parties, localities, or classes of business.

In the opinion of the court are found citations from the reports of the interstate commission in which are depicted the evils that are occasioned to the railway companies and the public by warfares over rate charges, and the advantages that are gained in many directions by proper conference and concert of action among the competing lines. It may be entirely true that, as we proceed in the development of the policy of public control over railway traffic, methods will be devised and put in operation by legislative enactment whereby railway companies and the public may be protected against the evils arising from unrestricted competition and from rate wars which unsettle the business of the community, but I fail to perceive the force of the argument that, because railway companies, through their own action, cause evils to themselves and the public by sudden changes or reductions in tariff rates, they must be permitted to deprive the community of the benefit of competition in securing reasonable rates for the transportation of the products of the country. Competition, free and unrestricted, is the general rule which governs all the ordinary business pursuits and transactions of life. Evils, as well as benefits, result therefrom. In the fierce heat of competition the stronger competitor may crush out the weaker. Fluctuations in prices may be caused that result in wreck and disaster, yet, balancing the benefits as against the evils, the law of competition remains as a controlling element in the business world. That free and unrestricted competition in the matter of railroad charges may be productive of evils does not militate against the fact that such is the law now governing the subject. No law can be enacted nor system be devised for the control of human affairs that in its enforcement does not produce some evil results, no matter how beneficial its general purpose may be. There are benefits and there are evils which result from the operation of the law of free competition between railway companies. The time may come when the companies will be relieved from the operation of this law, but they cannot, by combination and agreements among themselves, bring about this change. The fact that the provisions of the interstate commerce act may have changed in many respects the conduct of the companies in the carrying on of the public busi-

ness they are engaged in, does not show that it was the intent of congress in the enactment of that statute to clothe railway companies with the right to combine together for the purpose of avoiding the effects of competition on the subject of rates.

There are three general methods by which these rates may be established. It may be done by direct legislative enactment, (whereby either fixed rates or a maximum or minimum limit are enacted by the statute or by provisions for the adoption of rates by a commission,) or the rates may be adopted by the independent action of each company, acting under the spur of self-interest, and controlled by the effect of free competition, or the rates may be fixed by means of agreements or combinations between the rival lines of railway, whereby each contracting company is bound to charge the rate thus fixed and agreed upon. Congress has not yet undertaken to establish a standard of rates, either directly or through the action of a commission or the equivalent. Neither, in my judgment, has congress, in enacting the interstate commerce statute and the amendments thereto, conferred upon the railways the right to enter into combinations for the purpose of compelling the members to charge the rates fixed by a committee of the association, in whose deliberations the public have no part, and the avowed purpose of which is to evade the operations of the law of competition, which is as yet the only safeguard upon which the public can rely for the securing of the adoption of reasonable charges upon interstate traffic. I had always supposed that the enactment of the interstate commerce statute was the result of a popular demand, which insisted upon relief being given to the community as against the methods pursued by the railway companies which, in some particulars at least, were deemed to be inimical to the public interests. Looking at the causes which brought about the enactment of this statute, and the evils at which it was aimed, it does seem clear that it is wholly wrested from its purpose when it is held that it creates numerous radical and effective changes in the public policy of the nation touching competition between railroad companies engaged in interstate commerce. For the better protection of the rights of the public, and to sweep away the system of discriminations in favor of localities, individuals, or classes of business which had come into vogue, the interstate commerce act was intended to introduce radical changes in railway methods, but it never was intended to curtail the rights of the public and enlarge those of the railway corporations in any substantial particular. The argument of the majority is that, even if it were admitted that under common-law principles all contracts or combinations between public common carriers for the establishment of rates would be held to be contrary to public policy, nevertheless the enactment of the interstate commerce act revolutionized the law in this particular, and authorized railway companies to enter into combinations for the purpose of establishing reasonable restrictions upon the freedom of interstate commerce.

Reading that act in the light of the causes leading to its enact-

ment, I cannot find in any of its provisions foundation for the theory that it was intended to confer upon railway companies the right to enter into combinations which, under the principles of the common law, would be illegal, because contrary to public policy. The reasoning of the court is to the effect that "the interstate commerce law imposes several important restrictions upon the right of railway companies to do as they please in the matter of making and altering rates, and congress has thereby expressed its conviction that absolutely free competition between carriers is not at the present time conducive to the public welfare, and that other things are more essential to the public good."

I do not quarrel with the proposition that the interstate commerce act imposes important restrictions, (not upon the right, however,) but upon the practice of railway companies to do as they please in the matter of making and altering rates. But how does that fact tend to show that the act places restrictions upon the rights of the public? The congress of the United States may place restrictions upon the rights of the railway companies and upon the rights of the public, but the fact that congress may enact laws which are intended to change the methods pursued by the companies in certain particulars does not necessarily restrict the rights of the public. But if it be admitted that by some possible mode of construing the interstate commerce act, and the action of the commission created thereby, it can be held that under its provisions the railway companies became clothed with the right to combine together, and by mutual agreement to create restrictions upon the freedom of interstate commerce, so long as the same are reasonable,—which is the position of the court,—then would it not follow that the right thus created by the interstate commerce act is abrogated by the later enactment found in the anti-trust act, which expressly declares, not that unreasonable contracts, combinations, or restrictions are illegal, but that every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several states is illegal? The statute declares that restraint of interstate commerce, all restraints, every restraint of such trade and commerce brought about by contracts, combinations in the form of trusts or otherwise, or by conspiracy, are illegal. The statutory declaration in effect is that interstate trade and commerce are to remain free from restriction. The declaration of the court is, in effect, that railway companies engaged in interstate commerce may place restrictions upon such commerce; that the right so to do, if not existing under the common law, is conferred upon railway companies by the provisions of the interstate commerce act; that such restrictions cannot be held to be illegal unless it is shown that they are unreasonable, and the presumption is in favor of their reasonableness and consequent legality. I cannot believe that such is the meaning of the interstate commerce and the anti-trust acts. When the latter act was adopted, it had been declared by the supreme court of the United States to be the law that, with regard to the classes of business that are of a public nature, and are carried on to meet a public necessity, contracts im-

posing restraints thereon, however partial, cannot be sustained, because in contravention of public policy. It cannot be successfully questioned that railway companies engaged in interstate trade and commerce are carrying on a business of such a public character as of necessity places it in the class declared by the supreme court to be of such a nature that no restraint thereof, however partial, is permissible. It is a familiar principle that statutes are to be construed with reference to and in the light of the law existing at the date of their enactment. Thus reading the anti-trust act, is not the first section thereof intended to clearly enunciate in statutory form the principle already declared to be the law by the supreme court? The interstate commerce and anti-trust acts were passed for the protection of the interests and enforcement of the rights of the public. The view taken thereof in the opinion of the court results in curtailing the rights of the public and in enlarging the powers of railway companies. If the law be as is therein declared, then these public corporations, engaged in carrying on the public duty of constructing and operating the public highways, over which, of necessity, nearly the entire traffic of the country must be carried, are at liberty to combine together and determine in secret conclave the rates they will demand from the public for the services rendered, and enforce the imposition of the schedules thus fixed by penalties assessed against any party to the combination which may vary from the agreed schedule, and the individual citizen has no relief against rates thus fixed, unless he can satisfy some court or jury that the rate charged is unreasonable.

It is admitted in the opinion of the court that the contract in question has some tendency to check competition in rates, but it is said the restraint is slight, and therefore lawful. If the natural tendency is to check competition in the matter of rates, and to place a restraint, though but slight, upon the freedom of interstate traffic, what tribunal is to determine when the proper boundary has been passed, and by what standard is the lawfulness of the restraint to be measured? The legal consequence of the position of the court is that railway companies, by combinations between themselves, may fix the schedule of rates to be charged the public, and may bind themselves under penalties not to depart from the rates thus agreed upon, and the citizen is bound to pay the tariff thus established, unless he can satisfy a court that the sum charged is unreasonable. It may sound well to say that the courts are open to the citizen, and that they will afford him protection against the exaction of unreasonable rates, but we know that the supposed remedy would only aggravate the original wrong. It is said in the opinion of the court that there is nothing in the contract described in the bill which indicates any purpose or attempt to obtain a monopoly of the trade of the region traversed by the defendant corporations; that the systems of the Great Northern, the Northern Pacific, the Southern Pacific, and Texas Pacific Railway Companies are operated in the region subject to the regulations of the defendant association, but they are not members of it, and therefore the defendant companies cannot monopolize the entire traffic of the region. The great

majority of the patrons of the several lines of railway represented in the association in question do not live at competitive points. As to each of them the line of railway nearest to them has, of necessity, an absolute monopoly of the carrying trade belonging to the business in which they are engaged. Of what advantage to a farmer, a merchant, or a manufacturer doing business at or adjacent to a station upon a given line of railway is the fact that 20 or 50 or 500 miles from his place of business there is another railway line? The distance is so great, and the cost of reaching the same is so great, that he is practically debarred from making use of the same, and he has no choice in the matter. Parties doing business at competitive points may have free choice, and as to them it may be true that neither competing line has a monopoly of the business transacted at places where competition, being free and unrestricted, may work out its legitimate results, but this is not true of persons engaged in business at noncompetitive points. As to them, the control of the railway company adjacent to them is practically absolute. Of necessity, in such case the railway company has a complete monopoly of the entire transportation traffic of the region in which there is in fact no competing line. Against the evil tendencies of this monopoly, protection is afforded to the citizen by securing free and unrestrained competition between the lines of railway at the several points or localities where they in fact come into active competition, and, reasonable rates having thus been secured at these points, we have a standard established by which it may be determined whether the rates charged from intermediate noncompetitive points are reasonable or not, and the provisions of the interstate commerce act forbidding a greater charge for a shorter than a longer haul under similar circumstances may be invoked to secure a proper proportionate relation between the rates at competitive and noncompetitive points. If, however, the railway companies may combine together to fix the rates to be charged at competitive points, thus eliminating the effect of free competition, how fares it with the citizen residing at the noncompetitive point? By the very necessities of his location he is debarred from choosing the line of railway he will patronize. He is compelled to avail himself of the facilities afforded by the line nearest him. The railway therefore has the absolute monopoly of the transportation pertaining to the business of the citizen. It likewise has the exclusive control of the rates to be charged; and if the company, by contracts and combinations with the other lines of railway operating in the same region, may free itself from the restrictions afforded by free competition, what is lacking to constitute a complete and absolute monopoly of the transportation business thus dependent upon the given line of railway? The direct and necessary consequence of the contract entered into by the defendant companies is to create and perfect an absolute monopoly in each of the contracting parties over that part of the business carried over their respective lines which comes from that portion of the territory in which there is not in active operation a competing line; and, even as to regions which are so situated that competition might be had in the absence

of contracts preventing the effects thereof, a like monopoly is created by the contract entered into by the defendant companies.

In the matter of rates, competitive points are those where the transportation business of the locality is sought by two or more competing lines. In the case of sales of property at public auction, it is the rule that combinations among proposed purchasers, whereby it is agreed that they will not bid against one another, but the property shall be bid off at an agreed price for the common benefit of all the contracting parties, are illegal, and a sale thus made is voidable, because all fair competition is prevented by such combination. If the competitors for the transportation business of a given locality agree that there shall be no competition between them on the subject of rates to be charged, does not the same evil result? In the one case it is sought to deprive the owner of his property, without paying to him the fair value that would probably be bid in case competition was not stifled by the agreement between the purchasers. In the other the citizen is subjected to the payment of charges which are not the result of free competition, but are the result of combinations and mutual agreements, entered into for the express purpose of eliminating competition as an element in the determination of the rate to be charged. Thus points and localities which are competitive so long as there is active rivalry between the railway lines seeking the business of the region cease to be such when the rival lines combine and become, in effect, but one upon the subject of the charges to be demanded of the citizens. In such event the citizen becomes subject to a monopoly as complete and absolute as though there was but a single line of railway within his reach. Thus is found in the contract and combination entered into by the defendant companies elements which directly tend to the establishment of a monopoly, complete and absolute, over the transportation traffic in the region traversed by the lines of the defendant companies, due to the undeniable fact that the price charged for the transportation of the property of the community exercises a controlling influence over the question of the success or failure of the various business pursuits and avocations upon which the citizens are dependent for a livelihood, and, moreover, it directly affects and controls the cost to the public of all the necessaries of life.

The declaration found in article **I** of the contract shows upon its face the main purpose of the combination, it being therein recited that "the traffic to be included in the Trans-Missouri Freight Association shall be as follows: (1) All traffic competitive between any two or more members hereof passing between points in the following described territory," etc. Does not this clearly show that the main purpose of the contracting parties is to deal with that traffic which, in the absence of combinations between the railway companies, would be controlled by the results of competition, and to deal with it in such manner that it will cease to be competitive traffic and become the subject of combinations and agreements whereby the rates to be charged—which is the essential ele-

ment in which the public has a vital interest—is removed from the protection derivable from free and unrestrained competition, and is left to the determination of committees appointed by the railway companies, whose action is binding upon the members of the association, and against which the individual citizen is without adequate remedy, no matter how unjust the rate fixed by the committee may in fact be?

Another feature observable on the face of this contract is that by the exceptions contained in article I the traffic between many points and in some classes of freight are excepted out from the operation of the agreement, and thus it appears that it is the express purpose of the defendant companies to carry on part of their business subject to the results flowing from combinations between the carriers, and other portions are not to be affected thereby. Is it not the natural result that the public will be subjected to different burdens, and that differences in rates will be charged, which in effect will result in discriminations for or against particular localities? But I shall not dwell upon this and other points of minor importance. As I view the subject, the inherent and fatal vice existing in the combination and agreement entered into between the defendant railway companies is found in the fact, patent upon the face of the contract, that it is the main purpose of the contracting parties to stifle competition in the matter of rates to be charged the public. The illegality of such purpose is not dependent upon the extent of the restraint placed upon the freedom of the public business, but upon the fact that the avowed intent is to place a restraint, whether slight or great, upon a class of business which is inherently and always of a public nature, and touching which the declaration of the law, both common and statutory, is that it must remain wholly free and unrestricted. If the protection afforded by fair and free competition can be evaded and nullified by means of combinations such as are contemplated and provided for in the contract entered into by the defendants in this case, then the only safeguard against unreasonable rates will be stricken down, and thus interstate commerce will be subjected to the restraints and injuries flowing from the imposition of tariff rates agreed upon by the companies, but in the establishment of which the public has no direct control through legislation, nor direct influence through the effect of free competition.

In my judgment, the right to insist upon free competition between railway companies engaged in carrying on interstate commerce is a right which belongs to the public, of which it cannot be deprived except by its own consent, and every contract or combination between these public corporations which tends to remove the business carried on by them from the influence of free competition tends to deprive the public of this right, of necessity tends to subject interstate commerce to burdens which are a restraint thereon, is inimical to the public welfare, is contrary to public policy, and in contravention of both the language and spirit of the anti-trust act of July 2, 1890.